# No. 22-3205(L)
## No. 23-50 (CON)

# United States Court of Appeals for the Second Circuit

JODI ROUVIERE,

*Plaintiff-Appellant,*

.

ANDRE ROUVIERE, JODI ROUVIERE'S HUSBAND,

*Plaintiff,*

*vs*

HOWMEDICA OSTEONICS CORPORATION, DBA STRYKER ORTHOPAEDICS , DEPUY ORTHOPAEDICS, INC

*Defendants/Appellees*

.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (NEW YORK)

## Appellate SPECIAL APPENDIX
## Volume I of I (Pages AA-1 – AA-93)

JODI ROUVIERE, PRO SE
*for Plaintiff-Appellant*
10950 SW 84th Court
Miami, Florida 33156
(305) 608-8076

# TABLE OF CONTENTS
## (Special Appendix)

PAGES

Magistrate Court Order Disqualifying Plaintiffs Expert, ECF 193……………….…..SA-1

Magistrate Court Order Striking Dr. Jarrell's Opinions, ECF 232………………..….SA-7

Magistrate Court Order Denying Plaintiffs Motion for Reconsideration ECF 266……SA-14

District Court Order Granting Summary Judgment to Depuy, ECF 318………..…..…..SA-21

District Court Order Granting Summary Final Judgment to Stryker, ECF 351……..… SA-60

Judgment for Defendant Stryker, ECF 352…………………………………………...SA-92

Judgment for Defendant Depuy, ECF 361…………………………………….………SA-93

SA-1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___10/25/2020___

Jodi Rouviere, et al.,

                                            Plaintiffs,

                -against-

Depuy Orthopaedics, Inc. et al.,

                                            Defendants.

**1:18-cv-04814 (LJL) (SDA)**

**OPINION AND ORDER**

**STEWART D. AARON, United States Magistrate Judge:**

Before the Court is a motion by Defendant Howmedica Osteonics Corporation ("Howmedica"), doing business as Stryker Orthopaedics, to disqualify the metallurgical and material science engineer testifying expert (the "Engineer Expert")[1] retained by Plaintiffs, Jodi Rouviere and Andre Rouviere (collectively, "Plaintiffs"), and to stay certain discovery activities related to his disclosure. (Howmedica Not. of Mot., ECF No. 171.)[2] For the following reasons, Howmedica's motion to disqualify is GRANTED and its motion to stay is DENIED AS MOOT.

---

[1] Details regarding Plaintiff's Engineer Expert are contained in a Confidential Appendix to this Opinion and Order that will be filed under seal (the "Confidential Appendix"). The Engineer Expert is a "paid expert consultant for [Howmedica] in connection with the defense of two large-scale and long-standing consolidations of cases pertaining to certain HOC modular hip implant products." (Catullo Seal Decl., ECF No. 170, ¶ 2.) "The litigations consist of a Multidistrict Litigation pending in the United States District Court, as well as a Multicounty Litigation pending in state court in New Jersey (collectively 'the [Howmedica] Litigations')." (*Id*.) Information regarding the Engineer Expert is being filed under seal based upon Howmedica's representations that it would be harmed if the identity of its consulting expert and details regarding his confidential consultancy were disclosed. (*See* Howmedica 10/14/20 Ltr. Mot., ECF No. 169, at 1.)

[2] In deciding Howmedica's motion, the Court has reviewed and considered the filings at ECF Nos. 172 to 174, 181 and 190 to 192, all of which were filed under seal. By separate Order, the Court will be directing Howmedica to redact confidential information from each of these filings and to file redacted versions of each on the public docket, which versions the Court shall review to ensure that Howmedica was not over-inclusive in its redactions.

SA-2

## BACKGROUND

This is a medical device product liability case that was commenced on May 31, 2018 arising from injuries allegedly sustained by Plaintiff Jodi Rouviere after receiving a purportedly defective hip implant containing components manufactured by Howmedica and another defendant, Defendant DePuy Orthopaedics, Inc. (*See* Compl., ECF No. 1, ¶ 1; Am. Compl., ECF No. 26, ¶ 1.) The motion currently before the Court involves an expert who "switched sides" to testify on behalf of Plaintiffs against a client (Howmedica) on whose behalf he had done considerable consulting work in connection with other litigations for which his employers received substantial compensation.

After several extensions of discovery deadlines already had been granted, on June 22, 2020, the Court ordered that Plaintiffs' expert disclosures were to be served by September 21, 2020. (6/22/20 Order, ECF No. 128.) On Friday, September 18, 2020, Plaintiffs' counsel sent a letter to the Court requesting a one-week extension to serve their expert disclosures ostensibly because the night before an "engineer" expert "advise[d] the Plaintiffs that he was not willing to continue as Plaintiffs['] expert." (Pl.'s 9/18/20 Ltr., ECF No. 154.) By Order dated September 18, 2020, based upon the record before it, the Court denied Plaintiffs' request. (9/18/20 Order, ECF No. 157.) The Court stated: "Plaintiffs have not provided an adequate showing of cause to justify their eleventh-hour request. For example, Plaintiffs do not state when they first consulted with the 'engineer' expert, when they first retained him/her and/or what work product, if any, (s)he created." (*Id.*)

Also on Friday, September 18, 2020, Plaintiffs entered into a retainer agreement with the Engineer Expert at issue in Howmedica's motion. (Catullo Decl. Ex. B, ECF No. 173-2.) On Monday,

2

**SA-3**

September 21, 2020, Plaintiffs served the "Testifying Expert Report" of the Engineer Expert. (Catullo Decl. Ex. A, ECF No. 173-1.)

On October 14, 2020, Howmedica filed the motion now before the Court seeking to disqualify the Engineer Expert on the ground that Howmedica previously had retained him as a paid consultant to conduct confidential review, testing and analysis of other hip implant products in the defense of the Howmedica Litigations where issues were raised, which are "in vital ways similar to those raised in the present litigation." (*See* Howmedica Mem., ECF No. 172-1, at 1.) In opposition, Plaintiffs argue, among other things, that the Engineer Expert was not directly retained by Howmedica; that he has not done any work for Howmedica since 2017; and that the products at issue in this case are different from the products at issue in the case where the Engineer Expert performed work for Howmedica. (*See* Pls.' Opp. Mem., ECF No. 181, at 4-5.) In reply, Howmedica argues that a confidential relationship between Howmedica and the Engineer Expert "clearly exists;" that the Howmedica Litigations remain pending, such that the Engineer Expert's confidential relationship with Howmedica has not terminated; and that the Engineer Expert's work in the Howmedica Litigations is "clearly relevant to this case." (Howmedica Reply, ECF No. 191, at 1-2.)

## LEGAL STANDARDS

"The Court has the inherent power to disqualify an expert witness when such relief is warranted." *Rodriguez v. Pataki*, 293 F. Supp. 2d 305, 311 (S.D.N.Y.), *aff'd*, 293 F. Supp. 2d 315 (S.D.N.Y. 2003) (citation omitted). "Where the disqualification is sought because the expert previously was retained by another party, the movant bears the burden of establishing (1) that it was objectively reasonable for the movant to believe that it had a confidential relationship with

3

**SA-4**

the expert and (2) that the movant's confidential information was in fact disclosed to the expert." *Id*. (citations omitted).

"Disqualification is designed to protect the integrity of the judicial process by ensuring that experts do not use, even unwittingly, confidential information that they learned from a party in the course of an earlier engagement against that party in a later lawsuit." *Eastman Kodak Co. v. Kyocera Corp.*, No. 10-CV-06334 (CJS), 2012 WL 4103811, at *8 (W.D.N.Y. Sept. 17, 2012) (citation omitted). "Disqualification is a drastic remedy, however, and should be resorted to rarely." *Id*. at *8 (citation omitted).

I am deciding Howmedica's motion pursuant to the prior referral to me of all non-dispositive pretrial motions. *See Dreyer v. Ryder Auto. Carrier Grp., Inc.*, No. 98-CV-0082A (JF), 2005 WL 1074320, at *1 n.1 (W.D.N.Y. Feb. 9, 2005) ("A motion to disqualify a prospective testifying expert is non-dispositive in nature and subject to review as clearly erroneous or contrary to law."), *objections overruled*, 367 F. Supp. 2d 413 (W.D.N.Y. 2005).

## ANALYSIS

The Court finds that Howmedica has met its burden to disqualify the Engineer Expert. First, it was objectively reasonable for Howmedica to believe that it had a confidential relationship with the Engineer Expert. When the Engineer Expert first was retained, Howmedica's outside counsel signed an agreement with the Engineer Expert's employer in which the employer stated its "policy to keep the nature and scope of our client engagements confidential."[3]

---

[3] The fact that the Engineer Expert was retained through Howmedica's outside counsel, rather than Howmedica itself, is of no moment. It is not uncommon in litigation for outside counsel to retain an expert on a client's behalf. Indeed, in prior litigation in which the Engineer Expert was retained, he had been retained by counsel, not by the party herself. (*See* Confidential Appendix at 1.)

4

**SA-5**

(Confidential Appendix at 2.) In addition, the Engineer Expert signed a confidentiality agreement that was part of a protective order in one of the Howmedica Litigations in which he agreed to be bound by confidentiality obligations. (*See id*.) There was no reason for Howmedica to believe that its confidential relationship with the Engineer Expert had concluded since the Howmedica Litigations were stayed, not finally determined. (*See id*. at 5-6.)

Second, there is no dispute that Howmedica's confidential information was disclosed to the Engineer Expert. He received tens of thousands of pages of confidential Howmedica documents pertaining to the design and development of certain Howmedica hip devices, the materials used in those devices and the regulatory approval process. (*See* Confidential Appendix at 3.) In addition, the Engineer Expert met with Howmedica's defense attorneys on numerous occasions in connection with the Howmedica Litigations and was privy to Howmedica's litigation and trial defense strategies. (*See id*.)

Having carefully reviewed the submissions of the parties, the Court is satisfied that there is significant overlap between issues involved in the Howmedica Litigations and the issues involved in this case. (*See* Confidential Appendix at 4-5.) It simply would be unfair and would subvert the integrity of the judicial process to permit the Engineer Expert to switch sides as he is seeking to do here.

There will be no prejudice to Plaintiffs since they only had worked with the Engineer Expert for a few days prior to the issuance of his report (*i.e.*, from September 18 to 21, 2020). As set forth in the Conclusion below, Plaintiffs are being granted time to retain an alternate engineer expert.

**SA-6**

## CONCLUSION

For the foregoing reasons, Howmedica's motion to disqualify is GRANTED and its motion to stay is DENIED AS MOOT. No later than November 9, 2020, Plaintiffs may serve an expert disclosure by an alternate engineer expert regarding the same scope of subject areas as were covered by the Engineer Expert. The deposition of any such expert shall be completed no later than December 9, 2020. Any expert disclosure by Howmedica addressed to opinions offered by Plaintiffs' alternate engineer expert shall be served by January 14, 2021 and the deposition of such Howmedica expert shall be completed no later than February 12, 2021.

**SO ORDERED.**

Dated:      New York, New York
            October 25, 2020

_____
STEWART D. AARON
United States Magistrate Judge

6

SA-7

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___11/24/2020___

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Jodi Rouviere, et al.,

                    **Plaintiffs,**

          **-against-**

Depuy Orthopaedics, Inc. et al.,

                  **Defendants.**

**1:18-cv-04814 (LJL) (SDA)**

**OPINION AND ORDER**

**STEWART D. AARON, United States Magistrate Judge:**

Before the Court is a motion by Defendant DePuy Orthopaedics, Inc. ("DePuy") to strike or otherwise preclude the DePuy-related opinions offered by Plaintiffs' alternate engineer expert, John Jarrell, Ph.D. ("Jarrell"). (DePuy 11/13/20 Ltr. Mot., ECF No. 214.) For the reasons set forth below, DePuy's motion to strike is GRANTED.

**BACKGROUND**

This is a medical device product liability case that was commenced on May 31, 2018 arising from injuries allegedly sustained by Plaintiff Jodi Rouviere after receiving a purportedly defective hip implant containing components manufactured by DePuy and another defendant, Howmedica Osteonics Corporation ("Howmedica"), doing business as Stryker Orthopaedics. (*See* Compl., ECF No. 1, ¶ 1; Am. Compl., ECF No. 26, ¶ 1.) The motion currently before the Court follows an Opinion and Order by me granting Howmedica's motion to disqualify the Plaintiffs' prior engineer expert (the "Prior Engineer Expert"), who previously had been retained by Howmedica as a consulting expert in other litigation and who had "switched sides" to testify in this case against Howmedica. *See Rouviere v. DePuy Orthopaedics, Inc.*, No. 18-CV-04814 (LJL) (SDA), 2020 WL 6265659, at *1 (S.D.N.Y. Oct. 25, 2020). Familiarity with my prior Opinion and

Order is presumed. A brief discussion of the events leading up to the instant motion is provided below.

On June 22, 2020, already having granted several extensions of discovery deadlines, the Court ordered that Plaintiffs' expert disclosures were to be served by September 21, 2020. (6/22/20 Order, ECF No. 128.) On September 21, 2020, Plaintiffs served the "Testifying Expert Report" of the Prior Engineer Expert. (Catullo Decl. Ex. A, ECF No. 173-1.)[1] Notably, the Prior Engineer Expert offered opinions regarding Howmedica, but did not offer any opinions regarding DePuy or DePuy's failure to warn. (*See id*. at 12.)

On October 14, 2020, Howmedica filed a motion seeking to disqualify the Prior Engineer Expert on the ground that Howmedica previously had retained him as a paid consultant in the defense of litigations raising issues similar to those raised in the present case. (*See* Howmedica Mem., ECF No. 172-1, at 1.) On October 25, 2020, I granted Howmedica's motion to disqualify and stated that, "[n]o later than November 9, 2020, Plaintiffs may serve an expert disclosure by an alternate engineer expert regarding the same scope of subject areas as were covered by the [Prior] Engineer Expert." *See Rouviere*, 2020 WL 6265659, at *3. I also set a schedule for Howmedica to serve its own expert disclosure "addressed to opinions offered by Plaintiffs' alternate engineer expert." *See id*.

On October 21, 2020, while Howmedica's motion to disqualify was pending, DePuy filed a motion for summary judgment premised upon Plaintiffs' failure to present any expert testimony or, according to DePuy, any other evidence to support Plaintiffs' liability claims against

---

[1] A redacted version of ECF No. 173-1 is filed at ECF No. 215-3, commencing at PDF p. 3.

**SA-9**

DePuy. (*See* DePuy 11/13/20 Ltr. Mot. at 2.) According to DePuy, the Prior Engineer Expert "was the only expert disclosed by Plaintiffs [who] rendered opinions regarding design defect and failure to warn issues but all of those opinions were directed at [Howmedica]" and thus Plaintiff's had "no admissible expert testimony (or any other evidence) as to DePuy and the DePuy components to support any product defect or warning claims[.]" (*Id.*)

On October 31, 2020, Plaintiffs filed a letter motion requesting additional time to respond to DePuy's motion for summary judgment. (Pls.' 10/31/20 Ltr. Mot., ECF No. 201.) On November 2, 2020, DePuy opposed the extension, arguing that Plaintiffs' stated reason for needing additional time — *i.e.*, the disclosure of the alternate engineer expert — would not affect their response to DePuy's Motion. (*See* DePuy 11/2/20 Ltr. Rep., ECF No. 202.) In particular, DePuy stated that it anticipated that Plaintiffs would attempt to introduce new opinions, not expressed by the Prior Engineer Expert, regarding DePuy. (*See id.*) On November 3, 2020, Plaintiffs filed a reply regarding their motion for additional time. (*See* Pls.' 11/3/20 Reply, ECF No. 203.)

On November 3, 2020, District Judge Liman granted Plaintiffs' request for additional time, but "expresse[d] no view as to whether the anticipated engineer report falls within the scope of Judge Aaron's order." (*See* 11/3/20 Order, ECF No. 208.) Judge Liman stated: "Any motions with respect to whether the anticipated expert report fall[s] within the scope of Judge Aaron's order relieving Plaintiffs from the deadlines in the Case Management Plan and are properly addressed by him in the first instance." (*Id.* at 1.) He further stated: "As to any motions with respect to whether the expert report should be permitted in whole or in part, those should be addressed in the first instance to Judge Aaron to whom I have delegated general pretrial supervision with

3

review by me, upon an objection by a party, under the appropriate standard of review." (*Id*. at 2.)

On November 9, 2020, Plaintiffs served an expert report from their alternate engineer expert, Jarrell. (*See* DePuy Ltr. Mot. Ex. A, ECF No. 214-1.) Jarrell's report contains opinions regarding DePuy. (*See id*. at 8-10.) In particular, he opines that DePuy failed to warn of product defects. (*See id*.)

On November 13, 2020, DePuy filed its motion to strike or otherwise preclude the DePuy-related opinions offered by Jarrell. (*See* DePuy 11/13/20 Ltr. Mot.) On November 18, 2020, Plaintiffs filed their opposition to DePuy's motion. (Pls.' 11/18/20 Ltr. Resp., ECF No. 218.) On November 20, 2020, DePuy filed its reply. (DePuy 11/20/20 Reply, ECF No. 223.)[2]

Oral argument by telephone was held on November 24, 2020.

## LEGAL STANDARDS

Rule 16(b) of the Federal Rules of Civil Procedure addresses scheduling orders. *See* Fed. R. Civ. P. 16(b). Under that rule, scheduling orders "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "The Rule 16(b)(4) 'good cause' inquiry is primarily focused upon the diligence of the movant in attempting to comply with the existing scheduling order and the reasons advanced as justifying that order's amendment." *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 282 F.R.D. 76, 79 (S.D.N.Y. 2012) (citation omitted). "The burden of demonstrating good cause rests with the movant." *Id*.

---

[2] A redacted version of ECF No. 223 is filed at ECT No. 222.

4

**SA-11**

I am deciding DePuy's motion pursuant to the prior referral to me of all non-dispositive pretrial motions. *See RMed Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94-CV-05587 (PKL) (RLE), 2000 WL 420548, at *2 n.1 (S.D.N.Y. Apr. 18, 2000) ("A decision to admit or exclude expert testimony is considered 'nondispositive' of the litigation." (citations omitted)). A magistrate judge has discretion with respect to whether or not to permit the late submission of an expert report. *See Reynolds v. Sealift, Inc.*, 311 F. App'x 422, 426 (2d Cir. 2009) (finding no error in magistrate judge exercising discretion to refuse to extend discovery for submission of expert report); *see also Frydman v. Verschleiser*, No. 14-CV-08084, 2017 WL 1155919, at *2 (S.D.N.Y. Mar. 27, 2017) ("It was well-within Magistrate Judge Cott's discretion to enforce the discovery deadline for expert disclosure in this case by striking the untimely expert reports.").

## ANALYSIS

Prior to the September 21, 2020 deadline for the parties' expert disclosures, Plaintiffs failed to serve an expert disclosure regarding design defect and failure to warn issues as to DePuy. The expert report of the Prior Engineer Expert gave such opinions as to Howmedica, but not as to DePuy. (*See* Catullo Decl. Ex. A at 12.) On November 9, 2020, Plaintiffs, for the first time, offered failure to warn opinions as to DePuy, in the Jarrell expert report. (*See* DePuy Ltr. Mot. Ex. A at 8-10.) Because the Court finds that Plaintiffs have failed to make a showing of good cause for their failure to offer the DePuy-related opinions by the September 21, 2020 deadline, the Court grants DePuy's motion to strike.

My October 25, 2020 Order was not intended to, and did not, grant permission to Plaintiffs to submit expert opinions regarding DePuy. My Order stated that "[n]o later than November 9, 2020, Plaintiffs may serve an expert disclosure by an alternate engineer expert

5

**SA-12**

regarding the same scope of subject areas as were covered by the [Prior] Engineer Expert," and set a schedule for Howmedica to serve its own expert disclosure "addressed to opinions offered by Plaintiffs' alternate engineer expert." *See Rouviere*, 2020 WL 6265659, at *3. My Order did not set a schedule for DePuy to serve an expert disclosure because it was my intention that the alternate engineer expert report was to be limited to the opinions already expressed, which were addressed to Howmedica, not DePuy.

Plaintiffs' argument that the Jarrell expert report falls within the same scope of subject areas as those covered by the Prior Engineer Expert lacks merit. At oral argument, Plaintiffs conceded that Jarrell's opinions that DePuy has moved to strike concern DePuy's failure to warn, and that the Prior Engineer Expert expressed no opinion regarding DePuy's failure to warn. As confirmed by the one case Plaintiffs cite on this issue (*see* Pls.' 11/18/20 Ltr. Resp. at 4), permitting Plaintiffs to expand the scope of their expert report to include opinions regarding DePuy would constitute improper scope creep for a substitute expert. *See Lincoln Nat. Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, No. 04-CV-00396, 2010 WL 3892860, at *4 (N.D. Ind. Sept. 30, 2010) (holding that substitute expert would "only be permitted to address the same subject matter as the previous expert without making any meaningful changes").

Seizing upon a statement in DePuy's motion that the Prior Engineer Expert "previously testified on behalf of DePuy in hip litigation" (DePuy 11/13/20 Ltr. Mot. at 2), Plaintiffs in their response to DePuy's motion raise questions regarding whether the Prior Engineer Expert was "look[ing] out" for DePuy by not offering opinions as to DePuy. (*See* Pls.' 11/18/20 Ltr. Resp. at 4-5.) The Court finds this argument disingenuous, however, because Plaintiffs were aware of the content and scope of the report at the time they served it and, if they believed it was insufficient

6

**SA-13**

in scope because it failed to encompass opinions regarding DePuy, they could have sought relief from the September 21, 2020 deadline at that time.[3] Moreover, as DePuy states in its reply (*see* DePuy 11/20/20 Reply at 3), Plaintiffs' own disclosures to Defendants expressly indicate that the Prior Engineer Expert previously had testified as an expert in litigation in which DePuy was a party. At the time Plaintiffs disclosed the Prior Engineer Expert, they produced to Defendants a list of his prior testimony that identified five cases in which he had testified on behalf of DePuy or Johnson & Johnson[4] and three cases in which he had been retained by Barnes & Thornburg, DePuy's counsel in this action. (*See* DePuy 11/20/20 Reply at 3 & Ex. A (ECF No. 223-1).) Thus, Plaintiffs knew, or should have known, of the Prior Engineer Expert's prior relationship with DePuy at the time they served the Prior Engineer Expert's report, and cannot now complain of some possible bias that such expert had in favor of DePuy.

## CONCLUSION

For the foregoing reasons, DePuy's motion to strike the DePuy-related opinions offered by Jarrell (*see* DePuy Ltr. Mot. Ex. A at 8-10, ¶¶ 16-22) is GRANTED.

**SO ORDERED.**

Dated:      New York, New York
            November 24, 2020

_____
STEWART D. AARON
United States Magistrate Judge

---

[3] During oral argument, Plaintiffs' counsel stated that he received the report from the Prior Engineer Expert late in the day on September 21, 2020 and had little time to review it before the deadline. Even so, if Plaintiffs believed they had good cause to do so, Plaintiffs could have sought an extension of the deadline to submit expert opinions against DePuy in the days and weeks thereafter, but failed to do so.

[4] DePuy is part of the Johnson & Johnson family of companies.

**SA-14**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/19/2020

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Jodi Rouviere, et al.,

                                 Plaintiffs,

                    -against-

Depuy Orthopaedics, Inc. et al.,

                               Defendants.

**1:18-cv-04814 (LJL) (SDA)**

**OPINION AND ORDER**

**STEWART D. AARON, United States Magistrate Judge:**

Before the Court is Plaintiffs' motion, pursuant to Rule 59(e) of the Federal Rule of Civil Procedure and S.D.N.Y. Local Civil Rule 6.3, requesting the Court to alter, amend or set aside its Opinion and Order, dated November 24, 2020, granting the motion of Defendant DePuy Orthopaedics, Inc. ("DePuy") to strike or otherwise preclude the DePuy-related opinions offered by Plaintiffs' alternate engineer expert, John Jarrell, Ph.D. ("Jarrell"). (Pls.' Mot., ECF No. 244.) For the reasons set forth below, Plaintiffs' motion is DENIED.

## BACKGROUND

This is a medical device product liability case that was commenced on May 31, 2018 arising from injuries allegedly sustained by Plaintiff Jodi Rouviere after receiving a purportedly defective hip implant containing components manufactured by DePuy and another defendant, Howmedica Osteonics Corporation ("Howmedica"), doing business as Stryker Orthopaedics. (*See* Compl., ECF No. 1, ¶ 1; Am. Compl., ECF No. 26, ¶ 1.) The motion currently before the Court follows the Court's November 24, 2020 Opinion and Order ("November 24 Order"), granting DePuy's motion to strike or otherwise preclude the DePuy-related opinions offered by Jarrell. *See Rouviere v. DePuy Orthopaedics, Inc.*, No. 18-CV-04814 (LJL) (SDA), 2020 WL 6939646 (S.D.N.Y.

SA-15

Nov. 24, 2020).[1] The Court found that Plaintiffs failed to make a showing of good cause for their failure to offer the DePuy-related opinions by the September 21, 2020 deadline for expert disclosures, and thus granted DePuy's motion to strike. *See id*. at *3. Familiarity with the entirety of the November 24 Order is presumed.

One of the arguments that had been raised by Plaintiffs in opposition to DePuy's motion to strike was that there were "questions regarding whether the Prior Engineer Expert was 'look[ing] out' for DePuy by not offering opinions as to DePuy." *See Rouviere*, 2020 WL 6939646, at *3. The Court found this argument to be disingenuous "because Plaintiffs were aware of the content and scope of the [prior engineer expert] report at the time they served it and, if they believed it was insufficient in scope because it failed to encompass opinions regarding DePuy, they could have sought relief from the September 21, 2020 deadline at that time." *Id*. The Court also noted that, even though "Plaintiffs' counsel stated that he received the report from the Prior Engineer Expert late in the day on September 21, 2020 and had little time to review it before the deadline . . ., if Plaintiffs believed they had good cause to do so, Plaintiffs could have sought an extension of the deadline to submit expert opinions against DePuy in the days and weeks thereafter, but failed to do so." *Id*. at n.3.[2]

---

[1] The Court had granted Howmedica's motion to disqualify a prior engineer expert on the ground that Howmedica previously had retained him as a paid consultant in the defense of litigations raising issues similar to those raised in the present case, but the Court gave leave to Plaintiffs to serve an expert disclosure by an alternate engineer expert regarding the same scope of subject areas as were covered by the prior engineer expert. *See Rouviere*, 2020 WL 6939646, at *1. Plaintiffs thereafter served an expert disclosure by Jarrell, their alternate engineer expert, which included opinions as to DePuy, even though the prior engineer expert's report did not contain any DePuy-related opinions. *See id*. at *2.

[2] Although the prior engineer expert report, which did not contain any DePuy-related opinions, was served on September 21, 2020, Plaintiff did not seek an extension of time to submit DePuy-related opinions, but instead included DePuy-related opinions in the Jarrell report that was served on November 9, 2020.

In the November 24 Order, the Court also held, with respect to the prior engineer expert's work for DePuy, as follows:

> At the time Plaintiffs disclosed the Prior Engineer Expert, they produced to Defendants a list of his prior testimony that identified five cases in which he had testified on behalf of DePuy or Johnson & Johnson and three cases in which he had been retained by Barnes & Thornburg, DePuy's counsel in this action. (*See* DePuy 11/20/20 Reply at 3 & Ex. A (ECF No. 223-1).) Thus, Plaintiffs knew, or should have known, of the Prior Engineer Expert's prior relationship with DePuy at the time they served the Prior Engineer Expert's report, and cannot now complain of some possible bias that such expert had in favor of DePuy.

*Rouviere*, 2020 WL 6939646, at *3 (footnote omitted).

Plaintiffs did not file any objections to the November 24 Order. However, on December 5, 2020, Plaintiffs filed the motion for reconsideration that is now before the Court. (*See* Pls.' Mot.) The central premise of Plaintiffs' motion is that, during oral argument regarding DePuy's motion to strike, DePuy's counsel made a representation to the Court that there is no ongoing litigation in which the prior engineer expert is engaged on behalf of DePuy, which Plaintiffs contend is not true.[3] (*See* Pls.' Mem., ECF No. 250, at 10.) Plaintiffs argue that that the Court "was misled at the oral argument hearing by and relied on DePuy and its counsel's representation that the disqualified expert was not involved in any pending litigation." (*Id*. at 11.)

Plaintiffs submitted with their reconsideration motion a Declaration from Matt Morrison, who is a shareholder at the law firm of Harrison Davis Steakley Morrison Jones, P.C. ("Harrison Davis"). (Morrison Decl., ECF No. 245.) Mr. Morrison stated that he represents Bryon D. Rowe

---

[3] The transcript of the oral argument held on November 24 reflects that, prior to making the representation set forth in the text above, DePuy's counsel stated: "Disqualified expert did testify at deposition in 2014. That MDL has been resolved publicly. They're in process of settling those claims. There are no more bellwether cases. That is not an ongoing litigation in which the disqualified expert has any role." (11/24/20 Tr., ECF No. 248, at 14.)

3

and Melanie A. Rowe in the civil product liability case against DePuy entitled *Bryon D. Rowe and Melanie A. Rowe v. Depuy Orthopaedics, Inc. et al.*, No. 3:12-cv-04354-K (N.D. Tex. – Dallas Division). (Morrison Decl. ¶ 2.) Mr. Morrison stated that the *Rowe* case was transferred under the MDL case captioned and numbered *In Re: DePuy Orthopaedics, Inc. Pinnacle Hip Implant Product Liability Litigation*, MDL No. 2244 (N.D. Tex. – Dallas Division). (*Id*.) He also stated that the MDL case is still an open and pending litigation. (*Id*. ¶ 3.)

In response to Plaintiffs' motion for reconsideration, DePuy submitted a declaration from its counsel and also submitted a declaration from another shareholder at the Harrison Davis law firm. (*See* Eaton Decl., ECF No. 259-3; Davis Decl., ECF No. 259-4.[4]) These declarations are consistent with statements made by DePuy's counsel at oral argument that the "MDL has been resolved publicly," that "[t]hey're in process of settling those claims," that "[t]here are no more bellwether cases" and that the *Rowe* case "is not an ongoing litigation in which the disqualified expert has any role."[5] (11/24/20 Tr. at 14.)

On December 18, 2020, Plaintiffs filed their reply. (Reply, ECF No. 264.)

## LEGAL STANDARDS

Motions for reconsideration are governed by Local Civil Rule 6.3. The moving party must set forth "concisely the matters or controlling decisions which counsel believes the Court has overlooked." S. & E.D.N.Y. L. Civ. R. 6.3. Reconsideration only should be granted when the moving party "identifies an intervening change of controlling law, the availability of new evidence, or the

---

[4] Redacted versions of these Declarations are filed as part of ECF No. 263-1.

[5] Because the Court has granted DePuy's motion to seal certain portions of its declarations (*see* 12/19/20 Order, ECF No. 265), the Court does not set forth herein the precise content of the material portions of the declarations submitted by DePuy in opposition to the pending motion.

need to correct a clear error or prevent manifest injustice." *Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013); *see also LCS Grp., LLC v. Shire LLC*, No. 18-CV-02688 (AT) (SDA), 2020 WL 5077075, at *1 (S.D.N.Y. Aug. 27, 2020) ("The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995))).

Under Federal Rule of Civil Procedure 59(e), a district court may "alter or amend judgment to correct a clear error of law or prevent manifest injustice." *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 96 (2d Cir. 2014) (internal quotation marks omitted). Rule 59(e) has no application here since no judgment has been issued. *See* Fed. R. Civ. P. 59(e) ("A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."). In any event, even if applicable, a court should provide relief under Rule 59(e) only in rare cases. *See United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009). Rule 59 motions, like motions for reconsideration, are entrusted to the sound discretion of the district court. *See LCS Grp.*, 2020 WL 5077075, at *1.

## ANALYSIS

Plaintiffs have not met the strict standard for reconsideration because Plaintiffs have not provided to the Court anything that it overlooked that alters its conclusion that Plaintiffs failed to make a showing of good cause for their failure to offer the DePuy-related opinions by the September 21, 2020 deadline.

As an initial matter, the Court finds that DePuy's counsel did not make a misrepresentation to the Court. While there is some ambiguity as to whether, as stated by DePuy's counsel, there is "ongoing litigation in which the disqualified expert is engaged" (11/24/20 Tr. at 14), since the *Rowe* case still is an open and pending litigation, based upon the declarations submitted and the entire context of the statements made during oral argument, the Court is satisfied that the statements of DePuy's counsel did not constitute a misrepresentation to the Court.

In any event, the fact that the *Rowe* case is still an open and pending litigation does not alter the fact that Plaintiffs, after serving the prior engineer expert's report on September 21, never sought an extension of the deadline to submit expert opinions against DePuy. *See Rouviere*, 2020 WL 6939646, at *3. Nor does it alter the fact that Plaintiffs knew, or should have known, of the prior engineer expert's previous relationship with DePuy at the time they served the prior engineer expert's report on September 21, such that they cannot now be heard to complain of some possible bias that such expert had in favor of DePuy. *See id.*[6] Thus, as the Court previously found, "Plaintiffs have failed to make a showing of good cause for their failure to offer the DePuy-related opinions by the September 21, 2020 deadline." *Id*.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion, pursuant to Rule 59(e) of the Federal Rule of Civil Procedure and Local Civil Rule 6.3, requesting the Court to alter, amend or set aside its November 24 Order is DENIED.

---

[6] In its opposition memorandum, DePuy requests that Court award DePuy its attorneys' fees and costs in opposing Plaintiff's motion for reconsideration. (*See* DePuy Opp. Mem., ECF No. 258, at 19-20.) However, DePuy offers no statutory basis for the award of fees and costs and the Court finds none.

6

**SA-20**

**SO ORDERED.**

Dated:      New York, New York
              December 19, 2020

                                            _____
                                            STEWART D. AARON
                                            United States Magistrate Judge

**SA-21**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/17/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                  :

JODI ROUVIERE, et al.,                     :

                            Plaintiffs,      :

                       :               18-cv-4814 (LJL)

      -v-                    :

                       :      OPINION AND ORDER

DEPUY ORTHOPAEDICS, INC., et al.,   :

                       :

                    Defendants.    :

                       :
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

    This is a product-liability case involving hip replacement components. In 2012, Plaintiff

Jodi Rouviere ("Rouviere") had a hip replacement surgery. Her doctor implanted a device that

combined components made by two companies. Rouviere alleges that some of these components

impinged on other of the components, releasing toxic metal debris into her body. Rouviere and

her husband sued the two companies that made the components of the hip replacement device—

DePuy Orthopaedics, Inc. ("DePuy") and Howmedica Osteonics, Corp. (also known as

"Stryker"). The Rouvieres now object to a ruling by Magistrate Judge Aaron concerning the

scope of their engineering expert report. That objection is overruled. DePuy also moves for

summary judgment. That motion is granted.

## BACKGROUND

    The following facts are drawn from the parties' Local Rule 56.1 statements. They are

undisputed unless otherwise noted. *See* Dkt. Nos. 182, 227, 262.

    Jodi Rouviere injured her hip in a kitchen fall around 2009. Dkt. No. 227 ¶ 1. She had

several hip surgeries over the next few years. *Id.* ¶ 3. In 2011, Rouviere was diagnosed with

SA-22

Ehlers-Danlos Syndrome, a rare connective tissue disorder that causes structural weakness in muscles, eyes, heart, skin and other tissue. *Id.* ¶¶ 4–5.

Because of her condition, Rouviere could not find a surgeon in her hometown of Miami that was comfortable operating on her. *Id.* ¶ 6. So Rouviere traveled to New York to meet with Dr. Robert Buly at the Hospital for Special Surgery. *Id.* ¶ 7. Rouviere was in pain at the time and had difficulty walking. *Id.* ¶ 8. After getting a second opinion, Dr. Buly advised Rouviere to undergo a total right hip replacement surgery. *Id.* ¶ 9. Rouviere agreed.

The hip joint consists of a ball-and-socket mechanism. The ball sits at the top of the thighbone, or femur. The socket (or acetabulum) is inside the pelvis. The ball rotates in the socket, giving the hip a wide range of motion. During a hip replacement surgery, these hip joints may be replaced by metal, plastic, or ceramic parts to recreate the ball-and-socket mechanism. *See id.* ¶¶ 19–20. At Rouviere's surgery, both the ball and the socket were replaced with artificial components. *Id.* ¶ 13.

Before the surgery, Dr. Buly explained to Rouviere that there were several types of components that could be used in the implant. Dr. Buly also explained that he would make those choices during the surgery. *Id.* ¶¶ 12, 14. Rouviere agreed to rely on Dr. Buly to determine which components to use. *Id.* ¶ 14. Dr. Buly also warned Rouviere of the risks involved in her surgery, though the parties dispute the exact nature of the warnings. Rouviere underwent the hip replacement surgery in August 2012, performed by Dr. Buly. *Id.* ¶ 13.

At the surgery, Dr. Buly tested various components and ultimately implanted a device that contained five parts, from two different manufacturers:

1. To create the ball, Dr. Buly first implanted a "Summit" titanium stem made by DePuy. *Id.* ¶¶ 15, 60. The bottom half of the stem was placed inside the femur, while the "neck" protruded out from the femur. *Id.* ¶ 20.

2. At the tip of the neck, Dr. Buly attached a "Biolox Delta" ceramic head made by DePuy. *Id.* ¶¶ 15, 63. The below picture shows these two components (the two-tone grey stem and the pink head) inside a femur. *Id.* ¶ 20.



3. Dr. Buly then covered the ceramic head with a polyethylene insert made by Stryker.

4. To create the socket, Dr. Buly first implanted a round titanium shell into the pelvis. This part was made by Stryker.

5. Finally, Dr. Buly placed a round cobalt-chrome liner inside this shell. This part was also made by Stryker.

In the years after her surgery, Rouviere experienced chronic hip pain, dislocations, and other serious health problems. *Id.* ¶¶ 33–38, 40. In 2016, Rouviere underwent surgery with Dr. Carlos Alvarado in Miami. At the surgery, Dr. Alvarado observed that the Stryker acetabular components were impinging upon the DePuy stem and had created a notch in the neck of the stem. *Id.* ¶ 39. Dr. Alvarado also discovered grayish brown tissue in the surrounding area. *Id.* Rouviere underwent three more surgeries in 2016 and 2017, culminating in Dr. Alvarado removing the components that Dr. Buly had implanted five years earlier. *Id.* ¶ 43.

**PROCEDURAL HISTORY**

The Rouvieres filed suit in May 2018. They amended their complaint in October of that year. *See* Dkt. No. 26. They later voluntarily dismissed their claims against all defendants but two: DePuy and Stryker. Dkt. No. 52.

**SA-24**

The Rouvieres' theory of the case is that the DePuy titanium stem impinged with the Stryker cobalt-chrome liner, releasing toxic metals into Jodi Rouviere's body. Those metals caused various ailments in Rouviere, including metallosis. In the complaint, Rouviere asserts product-liability claims against DePuy and Stryker under theories of negligence, strict liability, and breach of express and implied warranties. Her husband, Andre Rouviere, also asserts a claim for loss of consortium.[1]

This matter was assigned to Magistrate Judge Stewart D. Aaron for general pretrial purposes. At the expert discovery phase, Judge Aaron ordered the Rouvieres to make their expert disclosures by September 21, 2020. *See* Dkt. No. 128. Three days before that deadline, the Rouvieres informed Judge Aaron that their engineering expert had suddenly withdrawn, and they asked for more time to find a replacement expert. *See* Dkt. No. 154. Judge Aaron denied that request on the ground that the Rouvieres' bare-bones letter did not make the requisite showing of good cause. *See* Dkt. No. 157. The Rouvieres then scrambled and found a second engineer expert in time for the deadline.

The second engineering expert completed a report for the Rouvieres. This report opined almost exclusively on Stryker's components, saying virtually nothing about DePuy. *See* Dkt. No. 188-1. Stryker moved to disqualify the Rouvieres' second expert on the ground that the expert had worked for Stryker in another litigation. Judge Aaron granted Stryker's motion to disqualify, but he allowed the Rouvieres additional time to find another replacement engineering expert. Judge Aaron's order specified that this third engineering expert could opine "regarding

---

[1] Andre Rouviere is a practicing lawyer in Florida. He represented himself and his wife through most of this litigation, though he is now joined by co-counsel.

the same scope of subject areas as were covered by the [disqualified second expert]." Dkt. No. 193 at 6.

The Rouvieres found a third engineering expert, Dr. John Jarrell.  By this time, DePuy had already filed its motion for summary judgment, which rested in large part on the absence of expert testimony about DePuy's products.  Dr. Jarrell's report remedied this deficiency by opining extensively about DePuy's products.  *See* Dkt. No. 230-5.  DePuy then asked Judge Aaron to strike the DePuy-related portions of the Jarrell report.  Judge Aaron granted the motion. Judge Aaron explained that, because the second engineering expert had opined solely on Stryker's products, the replacement engineering expert was likewise limited to opining only on Stryker's products.  *See* Dkt. No. 232.  Judge Aaron later denied the Rouvieres' motion for reconsideration, and the Rouvieres filed an objection to this Court.  *See* Dkt. Nos. 266, 267.

After DePuy's summary judgment motion was fully briefed, the Rouvieres asked Judge Aaron to reopen expert discovery due to Stryker's failure to disclose certain discovery materials. Judge Aaron granted the motion in part, allowing two of the Rouvieres' experts (Dr. Francis Gannon, a pathologist and immunologist, and Dr. Sol Bobst, a toxicologist) to supplement their previous expert reports.  *See* Dkt. No. 296.  But Judge Aaron denied the Rouvieres' request to allow their engineering expert to file a supplemental report.  The Rouvieres do not object to this order.  Instead, they have filed a motion asking this Court to augment the summary judgment record with Dr. Gannon's and Dr. Bobst's supplemental reports.

In sum, three matters are before this Court: (1) the Rouvieres' objection to Judge Aaron's striking of the DePuy-related opinions in the Jarrell report, (2) the Rouvieres' motion to supplement the record, and (3) DePuy's motion for summary judgment.

**LEGAL STANDARDS**

District courts may designate a magistrate judge to hear and decide a pretrial matter that is "not dispositive of a party's claim or defense." Fed. R. Civ. P. 72(a). For such nondispositive matters, the district judge "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." *Id.* "This standard of review is highly deferential, and magistrate judges are afforded broad discretion in resolving nondispositive disputes[;] reversal is appropriate only if their discretion is abused." *Pugh-Ozua v. Springhill Suites*, 2020 WL 6562376, at *3 (S.D.N.Y. Nov. 9, 2020) (cleaned up).

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009) (cleaned up). In determining whether there are any genuine issues of material fact, the Court must view all facts in the light most favorable to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

"On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense." *Cohen Lans LLP v. Naseman*, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Id.* To

6

survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), and by demonstrating more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## DISCUSSION

At the outset, the Court addresses the issues that shape the summary judgment record. First, the Rouvieres' objection to Judge Aaron's order limiting the scope of Dr. Jarrell's report is overruled. Dr. Jarrell's opinions about the alleged defects in DePuy's products are thus not in the summary judgment record. Second, the Rouvieres' motion to update the summary judgment record with supplemental reports by Drs. Gannon and Bobst is granted. These two supplemental reports will be considered as part of the summary judgment record. But the Rouvieres' request to file additional briefing is denied because the Gannon and Bobst reports are not particularly relevant to the pending motion for summary judgment.

Turning to DePuy's motion for summary judgment, the lack of expert testimony specific to DePuy dooms the Rouvieres' defective-design claims. And the Rouvieres do not defend their claims for defective manufacture and breaches of express or implied warranties, so those claims are abandoned. Finally, summary judgment is granted for DePuy on the failure-to-warn claims because the Rouvieres have adduced no evidence as to proximate causation. While a reasonable juror could find that DePuy failed to adequately warn Dr. Buly about the risk of impingement, there is no evidence to support the Rouvieres' contention that additional warnings would have led Dr. Buly to do anything differently.

## I.    The Rouvieres' Objection to the Order Striking Parts of the Jarrell Report

As detailed above, the Rouvieres' second engineering expert was disqualified after he had rendered a report and DePuy had moved for summary judgment. Judge Aaron allowed the

7

**SA-28**

Rouvieres to replace this expert with a third expert—Dr. Jarrell—but specified that Dr. Jarrell could testify only "regarding the same scope of subject areas as were covered by the [disqualified second expert]."  Dkt. No. 193 at 6.  When Dr. Jarrell furnished a report that contained opinions on defects in DePuy's products—opinions that were absent from the Rouvieres' earlier expert report—DePuy moved to strike those opinions.  Judge Aaron granted the motion, excluding the DePuy-related portions of the Jarrell report.  The Rouvieres moved for reconsideration, which Judge Aaron denied.  The Rouvieres now object both to the original ruling and to the ruling on the motion for reconsideration.

As explained below, the objection is likely untimely.  And even if it were timely, it is overruled on the merits.  Judge Aaron's order striking Dr. Jarrell's DePuy-related opinions was neither clearly erroneous nor contrary to the law.

### A.      Timeliness

Rule 72 requires that all objections to nondispositive orders by a magistrate judge be filed before the district judge "within 14 days after being served with a copy" and that "[a] party may not assign as error a defect in the order not timely objected to."  Fed. R. Civ. P. 72(a).  Judge Aaron struck the DePuy-related portions of the Jarrell report on November 24, 2020.  *See* Dkt. No. 232.  The Rouvieres did not file an objection within 14 days.  Instead, they filed a motion for reconsideration before Judge Aaron.  Judge Aaron denied that motion on December 19, 2020. *See* Dkt. No. 266.  The Rouvieres then filed an objection before this Court on January 4, 2021— 41 days after Judge Aaron's original order.  DePuy thus argues that the objection is untimely.

The key question is whether the filing of a motion for reconsideration before the magistrate judge affects Rule 72's 14-day deadline to file an objection before the district judge.

This question can be broken down into two subsidiary questions:  First, if a party asks the magistrate judge to reconsider a ruling, does the filing of the motion for reconsideration extend

**SA-29**

Rule 72(a)'s 14-day deadline to file an objection before the district court?  And second, if the answer to the first question is no, such that the magistrate judge's original order was not timely objected to, does a timely appeal of the reconsideration decision bring up both the original order (which was not timely objected to) and the reconsideration decision (with was timely objected to), or only the latter?  The Second Circuit has not weighed in on these issues, and courts throughout this district and throughout the country have reached opposite conclusions.[2]

Starting with the first question and the underlying statute, the Federal Magistrates Act provides that "a judge may designate a magistrate judge to hear and determine" certain pretrial matters, and that "[a] judge of the court [*i.e.*, a district judge] may reconsider any pretrial matter under [this provision] where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."  28 U.S.C § 636(b)(1)(A).

---

[2] *See David v. Weinstein Co.*, 2020 WL 4042773, at *5 n.2 (S.D.N.Y. July 17, 2020) (collecting cases for the proposition that "a motion for reconsideration filed directly with the magistrate judge is procedurally defective") (cleaned up); *Graham v. City of New York*, 2010 WL 3034618, at *1 n.1 (E.D.N.Y. Aug. 3, 2010) (collecting cases for the proposition that a timely motion for reconsideration tolls Rule 72's 14-day clock); *Manhattan Constr. Co. v. Phillips*, 2011 WL 13214354, at *4 (N.D. Ga. July 29, 2011) (collecting cases from throughout the country).

Building on this statute, Federal Rule of Civil Procedure 72 provides that:

> When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision. A party may serve and file objections to the order within 14 days after being served with a copy. A party may not assign as error a defect in the order not timely objected to. The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.

Fed. R. Civ. P. 72(a).

Rule 72's linear chronology appears to make no accommodation for motions to reconsider.[3] The chronology begins when the magistrate judge issues "a written order stating the decision" on a pretrial matter. Next, a party may object to "the order" within 14 days of being

---

[3] There is some disagreement over whether magistrate judges have the power to field motions for reconsideration at all, since Local Civil Rule 6.3 addresses motions for reconsideration but does not specify whether this mechanism applies only to district judges or also to magistrate judges. *Compare, e.g.*, *Koehler v. Bank of Bermuda Ltd.*, 2003 WL 466206, at *1 (S.D.N.Y. Feb. 21, 2003) ("Unlike motions for reconsideration of district judges' orders, provided for by Local Civil Rule 6.3[], there is no provision in the governing statute or the rules of procedure for motions for reconsideration to be made to magistrate judges."), *with Joint Stock Co. "Channel One Russia Worldwide" v. Infomir LLC*, 2020 WL 1480465, at *2 n.1 (S.D.N.Y. Mar. 26, 2020) ("[N]othing in the text of Local Civil Rule 6.3 suggests that it is inapplicable to orders issued by magistrate judges.") (cleaned up). But while this district's Local Civil Rules are not entirely clear on this issue, the Court agrees with the many district and magistrate judges who have held that magistrate judges have the power to field motions for reconsideration of their prior rulings. The Local Civil Rules, by their terms, "apply in all civil actions and proceedings governed by the Federal Rules of Civil Procedure." Local Civil Rule 1.1. They do not draw a distinction between those civil actions in which a district court judge is acting and those before a magistrate judge pursuant to authority delegated by the district court. For example, the rules regarding electronic service and filing of documents, Local Civil Rule 5.2; the service and filing of motion papers, Local Civil Rule 6.1; orders on motions, Local Civil Rule 6.2; and motion papers, Local Civil Rule 7.1, apply equally regardless of whether "the Court" in question is the district court judge assigned to the case or a magistrate judge exercising authority pursuant to a delegation from the district court. Thus, it is procedurally proper under Local Civil Rule 6.3 to ask a magistrate judge to reconsider his or her prior ruling. And indeed, magistrate judges in this district routinely entertain and decide motions for reconsideration under Local Civil Rule 6.3, as Judge Aaron did here. *See Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2019 WL 3738623, at *2 n.2 (S.D.N.Y. June 13, 2019) (collecting cases).

SA-31

served a copy.  And finally, the district judge must consider timely objections and must modify or set aside any part of "the order" that is clearly erroneous or is contrary to law.  A plain reading of Rule 72 thus suggests (a) that motions to reconsider filed before the magistrate judge have no bearing on the 14-deadline to file objections before the district court and (b) that an objection before the district court addresses only the order that was served within the preceding 14 days and does not bring up for appeal any earlier orders not timely objected to.

The language of Rule 72 is in stark contrast to its closest analogue, Rule 4 of the Federal Rules of Appellate Procedure.  *Cf. Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").  Rule 4 provides that a notice of appeal from a district court judgment must be filed within 30 days of the entry of judgment.  Fed. R. App. P. 4(a)(1)(A).  But if a party files a timely postjudgment motion for reconsideration, *i.e.*, a Rule 59 motion filed no later than 28 days after entry of judgment or a Rule 60 motion also filed no later than 28 days after entry of judgment, the rule provides that "the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion." Fed. R. App. P. 4(a)(4)(A).  As the Second Circuit explained, when a litigant files a timely motion for reconsideration, it "toll[s] the time to file a notice of appeal

11



regarding the underlying order until decision of the motion for reconsideration." *Lora v. O'Heaney*, 602 F.3d 106, 110 (2d Cir. 2010).[4]

This approach with respect to appeals to the courts of appeals is rooted in sound policy. Federal statutes discourage piecemeal appeals. *See Curtiss–Wright Corp. v. General Electric Co.*, 446 U.S. 1, 8 (1980). As a general matter, only a final judgment may be appealed to the court of appeals. *See* 28 U.S.C. § 1291 (allowing appeal only from "final decisions" of district courts); *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 265 (1982) ("[T]he policy of Congress embodied in [28 U.S.C. § 1291] is inimical to piecemeal appellate review of trial court decisions . . . ."). In the context of postjudgment motions, "judicial efficiency is improved by postponing appellate review of the judgment until the District Court has had an opportunity to dispose of all motions that seek to amend or alter what otherwise might appear to be a final judgment." *Weyant v. Okst*, 198 F.3d 311, 314 (2d Cir. 1999) (cleaned up). Given the length of time of most district court proceedings and the length of time necessary for an appeal to be briefed and decided, it would make little sense to require a second appeal for the order on the timely motion for reconsideration. It is far more efficient and consistent with the just, speedy, and inexpensive determination of every action to extend the time for noticing an appeal until after the motion for reconsideration is decided and for the court of appeals then to consider both the underlying judgment and the order on the motion. *See id.*; *see also Osterneck v. Ernst &*

---

[4] Many courts refer to this mechanism as "tolling," but that term is a misnomer. Tolling refers to the *pausing* of a time period. Federal Rule of Appellate Procedure 4, by contrast, *resets* the 30-day time period. *See* 16A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3950.4 (5th ed.) ("Courts often refer to [Federal Rule of Appellate Procedure 4's] re-starting effect as 'tolling,' . . . but readers should bear in mind that unlike, say, the 'tolling' of a statute of limitations, Rule 4(a)(4)'s 'tolling' (when it applies) re-starts the appeal time period from scratch.").

SA-33

*Whinney*, 489 U.S. 169, 177 (1989) ("Our conclusion that a postjudgment motion for discretionary prejudgment interest is a Rule 59(e) motion also helps further the important goal of avoiding piecemeal appellate review of judgments.").

The philosophy of the Federal Magistrates Act and Rule 72 is different. The delegation pursuant to Section 636(b)(1)(A) is for pretrial matters and non-dispositive matters only. 28 U.S.C. § 636(b)(1)(A). The rule contains the unusual injunction directing the judicial officer to conduct the required proceeding "promptly." Fed. R. Civ. P. 72(a). Absent consent, as well as an order of the court, a magistrate judge may not order the entry of judgment, conduct a civil trial, or decide a dispositive motion. 28 U.S.C. § 636(c)(1). Those matters are for the district judge. For that reason, because the magistrate judge's orders power is limited to pretrial matters such as the evidence that will be discoverable and that thus will form the basis of a trial or dispositive motion, and because the district judge alone has the power to enter final judgment resolving the case and into which all pretrial matters will be merged, Rule 72 not only requires that the nondispositive matter be addressed "promptly," but also *encourages* speedy interlocutory appeals. Any order can be challenged in the district court on the grounds that it is "clearly erroneous or contrary to law," 28 U.S.C. § 636(b)(1)(A), a standard different from that used by the court of appeals to review district court discovery orders, but such appeal must be taken within 14 days. The failure to file an objection within 14 days waives the right of a party to assign the magistrate judge decision as error. The rule thus vests control in the district court judge, and not in the parties or in the magistrate judge, as to the timing of briefing on and a decision with respect to a pretrial nondispositive matter. In other words, Rule 72 embodies a policy preference for speedy decisions and quick appeals to district courts rather than drawn-out motion practice before the magistrate judge. Until an appeal has been taken to the district court

13

SA-34

judge, the nondispositive discovery matter will not be finally settled.  So the filing of a motion for reconsideration, by the plain terms of Rule 72, has no effect on the 14-day deadline to file an objection before the district court.

Turning to the second question—whether the timely objection to a denial of reconsideration brings up the underlying order—the jurisprudence regarding Federal Rule of Appellate Procedure 4 again provides guidance.  Under Rule 4, when a litigant files an *untimely* motion for reconsideration, it "[does] not act to toll the time for appealing the underlying order." *Lora*, 602 F.3d at 110.  In such a case, "[t]he notice of appeal [is] timely only with respect to the ruling on the motion for reconsideration." *Id.*  In other words, "[b]y negative implication, Rule 4(a)(4)(A) suggests that failure to file a timely motion for reconsideration, combined with the failure to file a timely appeal of the substantive ruling, will put consideration of whether the substantive ruling was erroneous beyond the reach of an appellate court." *Id.*  If the motion for reconsideration was *not* timely filed, the resulting appeal can cover only the motion for reconsideration—which is reviewed very deferentially—and not the underlying order.  *See id.*; *see also "R" Best Produce, Inc. v. DiSapio*, 540 F.3d 115, 122 n.5 (2d Cir. 2008); *Wall v. Constr. & Gen. Laborers' Union*, 2009 WL 230122, at *1 (2d Cir. Feb. 2, 2009).

The same logic applies to motions for reconsideration filed before magistrate judges.  If a party chooses to file a motion for reconsideration instead of a Rule 72 objection—as the Rouvieres did here—and that party later files an objection to the reconsideration decision, that objection brings up only the reconsideration decision, not the underlying order.  In other words, the sole issue before the district court is whether the magistrate judge erred in denying reconsideration—and not whether the magistrate judge erred in his or her initial decision.  This conclusion flows from the text of Rule 72, which gives a party 14 days to object to "the order" of

**SA-35**

the magistrate judge and requires the district judge to modify or set aside any part of "the order" that is clearly erroneous or is contrary to law. In the context of a motion for reconsideration, "the order" is the reconsideration order (which is reviewed very deferentially), not the underlying order which was not timely objected to. A contrary rule would render meaningless Rule 72's 14-day deadline, since a party that misses the 14-day deadline would be able to simply file a motion for reconsideration and get in through the backdoor.

It may be argued that this rule imposes costs on both parties and the courts, forcing parties to concurrently file *both* an appeal before the district judge *and* a motion for reconsideration, and causing the filing of Rule 72 objections where a motion to reconsider would have sufficed. *See Fox Indus., Inc. v. Gurovich*, 2005 WL 2456896, at *2 (E.D.N.Y. Oct. 5, 2005) ("[I]t would make no sense for a District Judge to decide an appeal pursuant to Rule 72(a) while the order in question was still under consideration by the Magistrate Judge, who might change all or some of the order on reconsideration."). Those concerns are overstated. Where a party seeks reconsideration before a magistrate judge, the same or similar briefing will also support the appeal before the district court judge. After all, to obtain reconsideration, a party must establish *both* that the magistrate court judge overlooked factual matters or controlling decisions, *and* that, as a result, the magistrate judge's original order was in error. Although the standards on Rule 72 review are somewhat different from those on reconsideration, the underlying question remains the same—whether the magistrate judge's determination was "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A).

No persuasive argument has been made that a requirement that a party both brief an appeal and brief a motion for reconsideration will impose inordinate costs on litigants. And as to the courts, any burden on the district judge and the magistrate judge can be easily addressed. A

15

SA-36

party that wishes to seek reconsideration before the magistrate judge can ask the district judge to extend the time to file a Rule 72 objection until after the motion for reconsideration has been resolved. *See, e.g.*, *Miles v. Wal-Mart Stores, Inc.*, 2007 WL 2230383, at *1 (W.D. Ark. July 31, 2007) (granting motion to extend time to file Rule 72 objections until after resolution of motion to reconsider). If the party does not make such a request, the district court can suspend the Rule 72 briefing if the motion for reconsideration appears to have any merit or if the issue is better addressed by the magistrate judge in the first instance. In either event, the burden on the courts from the filing of a placeholder Rule 72 objection is de minimis, if any.

At the same time, those concerns ignore the offsetting costs that the rule advocated by the Rouvieres would impose on "the just, speedy, and inexpensive determination of every action," that the Federal Rules of Civil Procedure are intended to accomplish. Fed. R. Civ. P. 1; *see also Herbert v. Lando*, 441 U.S. 153, 177 (1979) ("[A]ll of the Federal Rules of Civil Procedure[] are subject to the injunction of Rule 1 that they be construed to secure the just, speedy, and inexpensive determination of every action.") (cleaned up); *Kerman v. City of New York*, 374 F.3d 93, 118 (2d Cir. 2004) (rejecting a construction of Rule 50 where the resulting procedure would be inconsistent with Rule 1's injunction). The Rouvieres no doubt subjectively believed that their motion for reconsideration had merit, even though the magistrate judge decided otherwise. That is not always the case. While a well-founded motion for reconsideration offers the judicial officer the opportunity to correct an oversight, a poorly founded motion imposes costs both on the judicial officer and on the opposing litigant. It can amount to little more than a request for a redo. *See Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 137 F. Supp. 3d 336, 338 (W.D.N.Y. 2015) (noting that "[motions for reconsideration] are, in general, not looked upon favorably" because "[a]ll too often, they represent little more than an attempt to reargue issues on which the movant



failed to persuade the court the first time around"). Moreover, in the hands of a crafty litigant, it can also be a tool to delay the inevitable, delaying discovery and delaying the final adjudication of the matter. Far better to require the appeal and to require the appellant to explain—at least to the district court judge and perhaps also to the magistrate judge—why the issue should not be promptly resolved by the only court with the power to finally settle it. To the extent that it discourages needless motions for reconsideration, the interpretation adopted by the Court may reduce the burden on the courts.[5]

In sum, the Rouvieres' objection to Judge Aaron's order of November 24, 2020 is overruled as untimely. The Court will nevertheless review that order on the merits for two reasons. First, because the Second Circuit has not clearly spoken to the timeliness issue, the Court addresses the merits in the alternative. And second, because the merits of the underlying issue may be relevant to the evaluation of the Rouvieres' objection to Judge Aaron's denial of reconsideration, a discussion of the merits will aid the Court's analysis. But, as explained below, the objection to the underlying order is overruled on the merits in any event. The Rouvieres'

---

[5] Some district courts have adopted local rules extending Rule 72's 14-day deadline if a motion for reconsideration is filed. For example, the local rules of the Northern District of New York provide that "[a] motion for reconsideration of a Magistrate Judge's determination of a non-dispositive matter shall toll the fourteen (14) day time period to file objections . . . ." N.D.N.Y. R. 60.1; *see also* D. Haw. R. 74.1(d) ("A reconsideration motion shall toll the time in which any objection must be taken from the magistrate judge's non-dispositive order . . . ."). It is worth noting that these local rules employ the "tolling" misnomer discussed above. This word choice, read literally, yields odd results. For example, suppose a magistrate judge issues a decision on January 1 and the losing party files a timely motion for reconsideration on January 13. Because the filing of the motion only *paused* the 14-day clock, the losing party has only one day from the issuance of the reconsideration order to file an objection before the district court. *See Utica Mut. Ins. Co. v. Century Indem. Co.*, 2017 WL 1052719, at *10 (N.D.N.Y. Jan. 18, 2017) (holding that The Northern District of New York's local rule "did not reset the clock" when the motion for reconsideration was decided but that "the clock resumed running" from its previous place); *see also id.* (citing the Black's Law Dictionary definition of "toll" as "to stop the running of" a time period).

17



objection to Judge Aaron's December 19, 2020 order denying reconsideration—which was timely filed—is denied on the merits as well.

**B.      Whether Judge Aaron's Orders Were Clearly Erroneous or Contrary to the Law**

Even if the Rouvieres' objection were timely, it would be overruled on the merits.  Judge Aaron's exclusion of Dr. Jarrell's DePuy-related opinions rested on Federal Rule of Civil Procedure 16(b)(4), which provides that "[a] schedule may be modified only for good cause and with the judge's consent."[6]  "The Rule 16(b)(4) 'good cause' inquiry is primarily focused upon the diligence of the movant in attempting to comply with the existing scheduling order and the reasons advanced as justifying that order's amendment." *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 282 F.R.D. 76, 79 (S.D.N.Y. 2012).  The burden of demonstrating good cause rested with the Rouvieres.  *Id.*

The Rouvieres make two primary arguments:  First, that Judge Aaron erred in concluding that the Jarrell report exceeded the scope of the disqualified expert's report.  And second, that even if the Jarrell report exceeded the scope of the disqualified expert's report, Judge Aaron

---

[6] Judge Aaron's exclusion of the DePuy-related portions of the Jarrell report could also have been framed as a sanction under Rule 37(c)(1), which allows a court to exclude evidence that was not timely disclosed "unless the failure was substantially justified or is harmless."  This would be a much closer call under Rule 37(c)(1), since "preclusion of evidence" under Rule 37 is a "harsh remed[y] and should be imposed only in rare situations." *Update Art, Inc. v. Modiin*, 843 F.2d 67, 71 (2d Cir. 1988).  But the parties did not raise Rule 37 before Judge Aaron, and Judge Aaron ruled solely under Rule 16.  *See* Dkt. Nos. 220, 222, 223, 232.  The Rouvieres' brief before this Court states that they "agree that the Magistrate Judge analyzed the issue pursuant to Rule 16 as a modification of a scheduling deadline, and therefore, a determination of whether the Magistrate Judge erred in his analysis is based on Rule 16," but nonetheless asks the Court to also consider Rule 37.  Dkt. No. 286 at 10.  The Court declines that invitation.  It would frustrate the purpose of delegation of pretrial nondispositive matters to a magistrate judge if a party could withhold from the magistrate judge's consideration a rule that the party later argues is dispositive of an issue.  If allowed, the losing party could then always obtain de novo review by asserting a new legal theory to the district court.  The Rouvieres made no Rule-37-based argument to Judge Aaron.  The Court's opinion therefore rests solely on Rule 16.

**SA-39**

erred in declining to reopen expert discovery to allow Dr. Jarrell to add new opinions.  Neither of these arguments succeed.  The Jarrell report expressed opinions well beyond those expressed in the disqualified expert's report, and Judge Aaron's denial of the Rouvieres' request to reopen expert discovery was not erroneous or contrary to the law.

*1. The disqualified expert did not opine on any defects in DePuy's products.*  The disqualified expert's report focused almost exclusively on Stryker, not DePuy.  For example, while the disqualified expert's report analyzed the warnings accompanying Stryker's products, it said nothing about DePuy's warnings.  *See* Dkt. No. 188-1 at 11.  And the "Opinions" section of the report speaks entirely of Stryker's defects in design, manufacture, and warning.  *Id.* at 11–12.  In fact, it blames *Stryker* for the impingement of the DePuy stem.  *See id.* at 12 ("The Stryker MDM Liner System was designed to impinge between the neck of the stem and the rim of the liner.").

To be sure, the disqualified expert made scattered references to DePuy:  He stated that he was hired to examine the DePuy and Stryker products.  *Id.* at 2.  He stated that he reviewed the DePuy and Stryker components.  *Id.* at 4–5.  He observed that the DePuy stem was dented.  *Id.* at 8.  And, most significantly, he opined that the Stryker liner impinged with the DePuy stem, resulting in metal debris.  *Id.* at 8, 9–10, 12.  But the disqualified expert expressed no opinions on whether DePuy's products were defectively designed, defectively manufactured, or contained insufficient warnings.

*2. Judge Aaron reasonably ordered that the replacement expert's opinions be limited to defects in Stryker's products.*  Judge Aaron's disqualification opinion said that the new expert could opine "regarding the same scope of subject areas as were covered by the [disqualified second expert]."  Dkt No. 193 at 6.  And since the only subject areas opined on by the



disqualified expert related to Stryker's liability, Judge Aaron's order is best understood as limiting the replacement expert's opinions to Stryker's liability.

A closer look at the disqualification order makes clear that the replacement report could cover only Stryker, which Judge Aaron refers to as "Howmedica." It provides that:

> No later than November 9, 2020, Plaintiffs may serve an expert disclosure by an alternate engineer expert regarding the same scope of subject areas as were covered by [the disqualified expert]. The deposition of any such expert shall be completed no later than December 9, 2020. Any expert disclosure by *Howmedica* addressed to opinions offered by Plaintiffs' alternate engineer expert shall be served by January 14, 2021 and the deposition of such *Howmedica* expert shall be completed no later than February 12, 2021.

*Id.* (emphasis added). If, as the Rouvieres argue, the replacement report could opine on both Stryker and DePuy, Judge Aaron would have provided for responsive disclosures by *both* of these defendants. But Judge Aaron provided for responsive disclosures by Stryker only, a clear indication as to the permissible scope of the replacement expert. The Rouvieres did not file an objection to this order. And even if they had, this limitation by Judge Aaron was reasonable given the scope of the disqualified expert's report. *See Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 784 (6th Cir. 2003) (affirming district court order that a substitute expert not deviate from the prior expert's conclusions as a "sensible compromise" that allowed the replacement of an expert "without unfairly surprising [the other party] with unexpected new opinions").

*3. Dr. Jarrell's report exceeds the scope of the disqualified expert's report.* Dr. Jarrell's report opines extensively about DePuy's liability, far exceeding the scope of the disqualified expert's opinions. For example, the disqualified expert said nothing about manufacturing defects in DePuy's products, while Dr. Jarrell opines that "the DePuy Summit femoral stem with Biolox head is defective." Dkt. No. 230-5 at 8. The disqualified expert offered no opinion about the

20

**SA-41**

warnings that accompanied DePuy's product, while Dr. Jarrell opines that "[t]he DePuy [instructions for use] lacks sufficient [w]arnings." *Id.* ¶ 18.  No reasonable reader of the Jarrell report can conclude that it covers "the same scope of subject areas as were covered by the [disqualified expert]." Dkt. No. 193 at 6.  By opining on DePuy's liability, the Jarrell report contravened Judge Aaron's order.

The Rouvieres argue that the scope of retention was the same for the two experts. *Compare* Dkt. No. 188-1 at 2 (disqualified expert's mission statement)*, with* Dkt. No. 230-5 ¶ 2 (Dr. Jarrell's mission statement).  But Judge Aaron's disqualification order did not permit the Rouvieres to submit a new expert report from a new expert with the same "scope of retention." The scope of the disqualified expert's retention was so broad as to cover anything that could potentially be relevant to the case.  The disqualified expert was retained "to evaluate the explanted hip protheses systems manufactured by DePuy Orthopedics and Stryker Orthopedics to determine if the components were defective in either their manufacture, design and/or failure to adequately warn." *See* Dkt. No. 188-1 at 2.   Under the Rouvieres' argument, Dr. Jarrell could have offered literally any opinion potentially relevant to the case under Judge Aaron's order with respect to either DePuy or Stryker, regardless of whether it bore any relationship to the scope of opinions offered by the disqualified expert.  Judge Aaron's order was not that expansive.  It said that the new expert could opine "regarding the same scope of subject areas as were *covered by* the [disqualified second expert]." Dkt No. 193 at 6 (emphasis added).  The best reading of this sentence is that it refers to the subject areas that the disqualified expert actually covered, not to subject areas that the disqualified expert *could have* covered under the scope of his retention. Judge Aaron's order sought to mitigate the effect of the disqualification of the Rouvieres' expert. It was not an invitation for the Rouvieres to redo their expert report from scratch.

21

*4. Judge Aaron reasonably concluded that the Rouvieres had not shown good cause for their request for an extension.* Judge Aaron also reasonably concluded that the Rouvieres "failed to make a showing of good cause for their failure to offer the DePuy-related opinions by the September 21, 2020 deadline." Dkt. No. 232 at 5. The Rouvieres did not explain why their first expert mysteriously withdrew. Nor did they explain why the disqualified expert failed to opine on DePuy. Nor did they seek additional time when they realized (or should have realized) that the disqualified expert did not opine on DePuy. Only after their expert was disqualified—and after DePuy had moved for summary judgment—did the Rouvieres seek to add DePuy-related opinions.

Judge Aaron had patiently extended many discovery deadlines leading up to that point. In granting a final extension, Judge Aaron had warned the parties that "[a]ny discovery not taken in the time periods set forth herein shall be deemed to be waived." Dkt. No. 128 at 4. Judge Aaron's denial of yet another request for an extension was justified. *See Reynolds v. Sealift, Inc.*, 311 F. App'x 422, 426 (2d Cir. 2009) (finding no error in magistrate judge exercising discretion to refuse to extend discovery for submission of expert report); *see also Frydman v. Verschleiser*, 2017 WL 1155919, at *2 (S.D.N.Y. Mar. 27, 2017) (same); *Ritchie Risk-Linked Strategies*, 282 F.R.D. at 79 ("A party seeking to reopen expert discovery must show that the tardy submission of its desired expert report was not caused by the party's own lack of diligence.").

*5. Judge Aaron's denial of reconsideration was neither clearly erroneous nor contrary to the law.* The Rouvieres' briefs do not specifically object to the reasoning in Judge Aaron's order denying reconsideration, focusing almost solely on Judge Aaron's underlying order. The Rouvieres' motion for reconsideration rested on the argument that DePuy's counsel had made a misrepresentation to Judge Aaron about the disqualified expert's relationship with DePuy. Judge

Aaron rejected this argument, finding that DePuy's counsel did not make a misrepresentation and that, in any event, (a) the Rouvieres could have sought an extension to offer DePuy-related opinions and (b) the Rouvieres knew or should have known of the disqualified expert's relationship with DePuy at the time that they served the disqualified expert's opinion. The Rouvieres offer no reason (other than the ones already discussed) to disturb any of these conclusions. Thus, to the extent that the Rouvieres object to Judge Aaron's December 19, 2020 order denying reconsideration, the objection is overruled for the same reasons discussed above. *See In re Palermo*, 2011 WL 446209, at \*4 (S.D.N.Y. Feb. 7, 2011) ("The standard for reconsideration under Local Civil Rule 6.3 is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked— matters, in other words that might reasonably be expected to alter the conclusion reached by the court.") (cleaned up).

In sum, the Rouvieres' objection is overruled on the merits even if it were timely. Dr. Jarrell's DePuy-related opinions are thus excluded from the record.

Though this result is harsh, it is not unfair. At the end of the day, the Rouvieres are left in the exact same position that they were in before the disqualified expert was disqualified: They have expert testimony on Stryker's liability but not on DePuy's. The disqualification of their expert gave the Rouvieres an opening to retroactively plug the holes in their disqualified expert's report. Judge Aaron rejected that gambit, placing the Rouvieres in the exact same position that they were in on September 21, 2020, when they timely filed their expert disclosures.

## II.     The Gannon and Bobst Reports

After expert discovery closed (and after issuing the order to strike), Judge Aaron allowed the Rouvieres to disclose supplemental reports by Dr. Gannon and Dr. Bobst, on the ground that important information had been inadvertently withheld by Stryker during fact discovery. *See*

Dkt. No. 296.  The Rouvieres disclosed these additional reports, and now seek to augment the

summary judgment record with these two supplemental reports.  That motion is granted.  The

two supplemental reports will be considered as part of the summary judgment record.

In the same motion, the Rouvieres also ask for additional briefing on DePuy's motion for

summary judgment.  That part of the motion is denied.  DePuy's motion for summary judgment

does not turn on the testimony of Drs. Gannon and Bobst, since DePuy does not raise issues of

pathology, immunology, or toxicology in its briefing.  DePuy's summary judgment papers do not

challenge the narrative that Jodi Rouviere was injured by metal debris in her body.  DePuy

instead focuses on the lack of evidence that DePuy's product was defective or that DePuy failed

to warn Dr. Buly of potential risks.  Neither of these issues are addressed by the Gannon and

Bobst reports, which focus on whether and how the metal debris caused Jodi Rouviere's injuries.

DePuy's motion for summary judgment is fully briefed, and additional briefing is not needed.

## III.    DePuy's Motion for Summary Judgment

Having addressed the breadth and content of the summary judgment record, the Court

turns to DePuy's motion for summary judgment.  After setting forth the general principles of

products liability under New York law, the Court concludes as follows:  First, the lack of expert

testimony dooms the Rouvieres' defective-design claims.  Second, the Rouvieres have

abandoned their claims for defective design, defective manufacture, and breach of express or

implied warranties.  Third, there is a genuine dispute about the adequacy of DePuy's warnings

but DePuy is nevertheless entitled to summary judgment because the Rouvieres have adduced no

evidence that DePuy's insufficient warnings proximately caused Jodi Rouviere's injury.  And

fourth, Andre Rouviere's loss-of-consortium claim is not viable as a standalone claim.  Summary

judgment is therefore granted to DePuy on all of the Rouvieres' claims against it.



### A.    New York Law on Products Liability

"In accordance with a long-standing and evolving common-law tradition, a manufacturer of a defective product is liable for injuries caused by the defect." *In re New York City Asbestos Litig.*, 27 N.Y.3d 765, 786–87 (2016).  A product is considered defective if it "(1) contains a manufacturing flaw; (2) is defectively designed; or (3) is not accompanied by adequate warnings for the use of the product." *Id.* (cleaned up).

"In design defect cases, the alleged product flaw arises from an intentional decision by the manufacturer to configure the product in a particular way.  In contrast, in strict products liability cases involving manufacturing defects, the harm arises from the product's failure to perform in the intended manner due to some flaw in the fabrication process." *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 257 n.3 (1995).  Claims under the last category—failure to warn— can be "framed in terms of strict liability or negligence," but the two causes of action are "functionally equivalent." *In re New York City Asbestos Litig.*, 27 N.Y.3d at 87.

### B.    The Defective-Design Claims

DePuy moves for summary judgment on the defective-design claims on the ground that— without Dr. Jarrell's DePuy-related opinions—the Rouvieres have adduced no expert testimony that DePuy's products were defectively designed.  In New York, defective-design claims must usually be supported by expert testimony as to the feasibility and efficacy of alternative designs. *See Nemes v. Dick's Sporting Goods, Inc.*, 2021 WL 739032, at *4 (S.D.N.Y. Feb. 23, 2021) (collecting cases); *see also Water Pollution Control Auth. of the City of Norwalk v. Flowserve US, Inc.*, 782 F. App'x 9, 15 (2d Cir. 2019) ("We agree with the district court that this is the type of complex case which requires an expert opinion as to defect and as to feasible alternative design.") (cleaned up).  The Rouvieres make no argument to the contrary, nor do they point to any non-expert evidence that the DePuy products were defectively designed.  Indeed, they make

no argument at all in defense of their defective-design claims. *See Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) ("Having determined that the district court acted within its discretion in excluding [an expert's] testimony, the plaintiff has no evidence in the record to support his theory that the motor had a design defect which caused the accident or increased its severity. As a result, summary judgment was properly granted."); *Jackson v. Federal Express*, 766 F.3d 189, 197–198 (2d Cir. 2014) ("Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended."). Summary judgment is therefore granted for DePuy on the Rouvieres' negligence and strict-products-liability claims (counts one and two) to the extent they are based on a defective-design theory.

C.     **The Defective-Manufacture Claims**

"To prove the existence of a manufacturing defect, a plaintiff must establish that the product was not built to specifications or that it did not conform to the manufacturer's intended design." *Minda v. Biomet, Inc.*, 182 F.3d 900 at *1 (2d Cir. 1999) (unpublished decision). Summary judgment is warranted because the Rouvieres' opposition brief does not point to any evidence of defective manufacture, nor does it defend the defective-manufacture theory of liability. The Rouvieres have thus abandoned this claim by not responding to any of DePuy's arguments. *See Jackson*, 766 F.3d at 197–198. Summary judgment is therefore granted for DePuy on the Rouvieres' negligence and strict-products-liability claims (counts one and two) to the extent they are based on a defective-manufacture theory.

D.     **The Breach-of-Warranty Claims**

DePuy moves for summary judgment on the Rouvieres' claims for breach of express and implied warranties. DePuy argues (a) that both of these claims require an underlying design or manufacturing defect, and the Rouvieres have adduced no evidence of either; (b) that DePuy

26



made no express warranties to the Rouvieres; and (c) that the implied-warranty claim is time-barred. *See* Dkt. No. 179 at 16–18. The Rouvieres do not respond to these arguments and do not defend their breach-of-warranty claims in their opposition brief. In fact, they include no discussion of these claims other than a recitation of their elements. *See* Dkt. No. 233 at 41–43. The Rouvieres have abandoned these claims. *See Nemes*, 2021 WL 739032, at *13. Summary judgment is therefore granted to DePuy on counts three and four.

### E.      The Failure-to-Warn Claims

The Rouvieres focus all of their energies defending the failure-to-warn claims. As DePuy concedes, there is no bright-line rule requiring expert testimony for failure-to-warn claims. *See Billiar v. Minnesota Min. & Mfg. Co.*, 623 F.2d 240, 246–47 (2d Cir. 1980). DePuy makes three arguments in favor of summary judgment: First, that it had no duty to warn. Second, that even if it did have a duty to warn, it adequately warned Dr. Buly of the impingement risk. And third, that, even if it did not adequately warn Dr. Buly, its failure to warn was not a proximate cause of Jodi Rouviere's injuries. Each argument is discussed in turn.

### 1.      Whether DePuy Had a Duty to Warn

A manufacturer has a duty to warn of any "latent dangers resulting from foreseeable uses of its products of which it knew or should have known." *Rastelli v. Goodyear Tire & Rubber Co.*, 79 N.Y.2d 289, 297 (1992). DePuy concedes that it had a duty to warn of dangers resulting from the use of *its* product. But DePuy argues that it had no duty to warn of any dangers that stem solely from Stryker's products. While DePuy is correct, it still does not warrant summary judgment in its favor. That is because the Rouvieres' claim is that DePuy failed to warn of the impingement risk in *DePuy's* product, not just Stryker's product.

To determine whether there existed a duty to warn, "the court must settle upon the most reasonable allocation of risks, burdens and costs among the parties and within society,

**SA-48**

accounting for the economic impact of a duty, pertinent scientific information, the relationship between the parties, the identity of the person or entity best positioned to avoid the harm in question, the public policy served by the presence or absence of a duty and the logical basis of a duty." *In re New York City Asbestos Litig.*, 27 N.Y.3d 765, 788 (2016). One "major determinant" is "whether the manufacturer is in a superior position to know of and warn against those hazards." *Id.* at 790. "[T]he existence and scope of a duty to warn are generally fact-specific," and "it is incumbent on the court . . . to decide whether an applicable legal duty exists" by "decid[ing] whether there is any proof in the record that might support the recognition of a duty to warn owed by the manufacturer to the injured party." *Id.* at 787 (cleaned up).

 *Rastelli* is the key case here. The defendant in *Rastelli* had manufactured a non-defective tire. A downstream purchaser combined the tire with a defective rim. The rim exploded, killing a person who was inflating the tire. The New York Court of Appeals held that the tire manufacturer had no duty to warn about the rim. The fact that the tire was "compatible for use with a defective product of the other manufacturer" was not enough. *Rastelli*, 79 N.Y.2d at 298. There was no evidence that the tire manufacturer had created the dangerous condition, so it "had no duty to warn about the use of its tire with potentially dangerous multipiece rims produced by another where [the tire manufacturer] did not contribute to the alleged defect in a product, had no

28

**SA-49**

control over it, and did not produce it." *Id.* Thus, DePuy is correct that it had no duty to warn of dangers that were solely attributable to Stryker's products.[7]

But DePuy is still not off the hook. *Rastelli* recognized that "where the combination of one sound product with another sound product creates a dangerous condition," then "the manufacturer of each product has a duty to warn." *Id.* Thus, even if DePuy had no duty to warn about Stryker's products, it still had a duty to warn of "latent dangers resulting from foreseeable uses of *its* products." *Id.* at 297 (emphasis added). The Rouvieres claim that DePuy should have warned about the risk of component impingement in the *DePuy* stem. In this respect, this case is different than *Rastelli*. There, the tire was not defective and did not cause the harm. Here, DePuy's stem allegedly *did* cause the harm by impinging with other components and releasing toxic metals. The alleged risk is thus with DePuy's product, arguably imposing on DePuy a duty to warn.

There is no genuine dispute that the DePuy stem became dented, which the Rouvieres attribute to impingement. Nor is there is a dispute that DePuy was aware of the risk of impingement—indeed, DePuy argues that it *warned* of impingement. And even if there is no evidence that the DePuy stem was defectively designed or manufactured (because the Rouvieres lack expert testimony on that front) the duty to warn applies even to non-defective products. A reasonable juror could find that DePuy had a duty to warn of this risk. *See Greenberg v. Larox,*

---

[7] The New York Court of Appeals has carved out an exception to the *Rastelli* rule, holding that manufacturers do have a duty to warn of dangers associated with a third-party product where "as a matter of design, mechanics or economic necessity, [the third-party product] is necessary to enable the manufacturer's product to function as intended." *In re New York City Asbestos Litig.*, 27 N.Y.3d at 778. But that exception does not apply here because the Stryker acetabular components are not "necessary" to the use of the DePuy stem. Indeed, DePuy makes its own acetabular components and recommends *against* pairing its stem with acetabular components from other manufacturers. *See* Dkt. No. 187-5 at 6.



*Inc.*, 673 F. App'x 66, 71 (2d Cir. 2016) (reversing grant of summary judgment because "the factual dispute over [the defendant]'s contribution to the danger arising from the joint use of its [product] with a [another manufacturer's product] bears on the issue of whether it knew about, and could reasonably foresee, this danger of malfunction and injury" and which, in turn, "affects whether [the defendant] had a duty to warn at all"). Viewing the evidence in the light most favorable to the Rouvieres, the Court cannot conclude, as a matter of law, that DePuy had no duty to warn of the risk of impingement associated with the DePuy stem.

### 2. Whether DePuy Adequately Warned of the Risk of Impingement

DePuy next argues that, even if it did have a duty to warn, it has fulfilled that duty by adequately warning Dr. Buly of the risk of impingement. A warning is adequate if it is "accurate, clear, consistent on its face, and . . . portrays with sufficient intensity the risk involved." *Martin v. Hacker*, 83 N.Y.2d 1, 10 (1993).

Under the "learned intermediary" doctrine, DePuy's obligation was to warn Jodi Rouviere's doctor rather than Rouviere herself. *See Bravman v. Baxter Healthcare Corp.*, 984 F.2d 71, 75 (2d Cir. 1993). "This rule is based on the theory that the doctor is better able to explain the product's risks and benefits to the patient, who will then be in a position to make an informed decision as to whether or not to have a certain procedure." *Minda v. Biomet, Inc.*, 1998 WL 817690, at *6 (E.D.N.Y. Feb. 5, 1998). Thus, "where the warning given to the prescribing physician by the manufacturer through package inserts and other literature gives specific detailed information on the risks of the product, the manufacturer [can be] absolved from liability as a matter of law." *Fane v. Zimmer, Inc.*, 927 F.2d 124, 129 (2d Cir. 1991) (cleaned up). DePuy argues that it warned Dr. Buly of the risk of impingement, pointing to the instructions for use ("IFU") that accompanied the DePuy stem.

But there are genuine factual disputes about the adequacy of these warnings.  The IFU instructs surgeons that, before completing the surgery, "[r]ange of motion should be thoroughly checked for improper mating, instability, or *impingement* and corrected as appropriate."  Dkt. No. 227 ¶ 27 (emphasis added); Dkt. No. 187-5 at 8.  But this sentence does not appear in the "Warnings" section of the IFU but instead appears among the instructions on how to perform the implant surgery.  This sentence says nothing about the risk of impingement *after* the surgery.  Nor does it say anything about the risk that impingement could create metal debris.  And besides, the Rouvieres argue that the unadorned word "impingement" could refer to either anatomical impingement—which occurs when the implant impinges on the patient's body—or component impingement, which occurs when one part of the implant impinges on another part of the implant.  DePuy's reply brief does not respond to this point or explain the difference (if any) between anatomical impingement and component impingement.  And while DePuy points to other warnings, none of those even mention impingement.  *See* Dkt. No. 187-5 at 7 (warning of "tissue reactions, osteolysis, and/or implant loosening caused by metallic corrosion, allergic reactions, or the accumulation of polyethylene or metal wear debris"); *id.* (warning of "[s]ubluxation or dislocation of the hip joint due to implant size or configuration selection, positioning of components and/or muscle and fibrous tissue laxity").

DePuy also argues that it warned Dr. Buly not to use the DePuy stem with acetabular components made by other manufacturers, pointing to the IFU warning that "[i]mplants and trials components from different manufacturers or implant systems should never be used together." *Id.* at 6.  But this warning does not say why mixing and matching should be avoided, nor does it say that mixing and matching can lead to impingement.  This warning does not preclude a reasonable juror from finding that this warning was too broad and that the IFU did not sufficiently

31

**SA-52**

communicate the risk of impingement. *See Moretto v. G & W Elec. Co.*, 20 F.3d 1214, 1223 (2d Cir. 1994) ("The ten-word warning in a 403-word letter in no way portrayed with sufficient intensity the risk involved to warrant taking this question from the jury."); *cf. Wu Jiang v. Ridge Tool Co.*, 764 F. App'x 43, 45 (2d Cir. 2019) (affirming grant of summary judgment where "[t]he warnings clearly and emphatically alerted users to the dangers of using the vacuum to collect flammable dust").

In sum, the Court cannot find that any of these warnings were adequate as a matter of law. When viewed in the light most favorable to the Rouvieres, a reasonable juror could find that these warnings were not "accurate, clear, [and] consistent on its face" as to the risk of component impingement and metal debris or did not "portray[] with sufficient intensity the risk involved." *Martin*, 83 N.Y.2d at 10. A reasonable juror could likewise find that the warning about impingement pertained only to anatomical impingement and thus did not warn of "the precise malady incurred." *Alston v. Caraco Pharm., Inc.*, 670 F. Supp. 2d 279, 284 (S.D.N.Y. 2009) (cleaned up); *cf. Maxwell v. Howmedica Osteonics Corp.*, 713 F. Supp. 2d 84, 95 (N.D.N.Y. 2010) (granting summary judgment to manufacturer of knee replacement device because package insert warned of the device's nickel content).

"The adequacy of the instruction or warning is generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of summary judgment." *Urena v. Biro Mfg. Co.*, 114 F.3d 359, 366 (2d Cir. 1997) (cleaned up). Such is the case here.

> **3.    Whether the Allegedly Deficient Warnings Proximately Caused Jodi Rouviere's Injuries**

Having concluded that there is a genuine dispute over whether DePuy's warnings were deficient, the Court turns to the issue of proximate causation. At trial, Jodi Rouviere must "prove that [the] defendant's failure to warn was a proximate cause of [her] injury," which

includes "adducing proof that the user of a product would have read and heeded a warning had one been given." *Sosna v. Am. Home Prod.*, 748 N.Y.S.2d 548, 549 (1st Dep't 2002); *see also Fane v. Zimmer, Inc.*, 927 F.2d 124, 131 (2d Cir. 1991). The Rouvieres proffer two theories of proximate causation. First, that Dr. Buly would not have used the DePuy components had he been adequately warned about the risk of impingement. And second, that more robust warnings by DePuy would have led Dr. Buly to give Rouviere more detailed warnings, in which case she would not have consented to the surgery. But, as explained below, neither of these theories is supported by evidence in the record.

a.   **Whether different warnings would have led Dr. Buly not to use the components at issue**

The Rouvieres' first theory of proximate causation is that an appropriate warning in the IFU would have dissuaded Dr. Buly from using the components that he implanted in Jodi Rouviere. This theory rests on three premises: (a) that Dr. Buly was not independently aware of the impingement risk at issue; (b) that Dr. Buly read the IFU; and (c) that, had the IFU contained a more robust warning, Dr. Buly would have done something different.

Even assuming that the first two premises are true, the Rouvieres proffer no evidence to support the third premise—that, had Dr. Buly been given additional warnings about impingement, he would have chosen different components or have recommended against the surgery. Indeed, the Rouvieres do not even dispute that Dr. Buly was aware of the impingement risk at the time of the surgery: DePuy's Local Civil Rule 56.1 statement states that "Dr. Buly testified he was aware of [the risk of component impingement] at the time of the August 2012 total hip replacement surgery—particularly so in this case given Mrs. Rouviere's diagnosed Ehlers-Danlos Syndrome." Dkt. No. 227 ¶ 26. Though the Rouvieres object to other portions of

**SA-54**

that paragraph, they say nothing in opposition to the quoted language, let alone point to evidence in the record contradicting it.

Dr. Buly sat for two depositions, and the Rouvieres had ample opportunity to elicit facts that would "permit a jury reasonably to infer that a warning, reasonably required, would have been heeded." *Raney v. Owens-Illinois, Inc.*, 897 F.2d 94, 96 (2d Cir. 1990). But the Rouvieres point to no evidence, testimonial or otherwise, that Dr. Buly would have done anything differently. To the contrary: Dr. Buly testified that he planned to continue using the DePuy stem even knowing what he knows now. *See* Dkt. No. 316-1 at 280–89. The Rouvieres do not question Dr. Buly's credibility or recollection (except for a disagreement over the contents of Dr. Buly's pre-surgery warnings to Jodi Rouviere, which is not relevant here). Nor do the Rouvieres have any testimony or evidence, expert or otherwise, that a reasonable surgeon, having received additional warnings, would not have done what Dr. Buly did. There is simply no evidence that a warning—if it had been given—would have been so material or important that Dr. Buly would have heeded it or would have done something different.

The Second Circuit has rejected the notion that New York has a "heeding presumption" under which a jury may "infer, whenever the facts show that a warning is required, that a warning would have been heeded." *Raney*, 897 F.2d at 95. Rather, "New York permits the trier to infer that a warning would have been heeded and thereby to conclude that the absence of a warning that was reasonably required to be given was a proximate cause of an injury." *Id.* But, as discussed above, the Rouvieres have proffered no facts that would allow a jury to make that inference without resort to speculation. *See id.* at 96 (collecting cases for the proposition that "in some circumstances it is not reasonable to draw an inference that a warning would have been heeded"); *see also Adeghe v. Janssen Pharms., Inc.*, 2017 WL 3741310, at *6 (S.D.N.Y. Aug.

34

**SA-55**

30, 2017) (rejecting the heeding presumption in context of summary judgment). This is especially true here, where the Rouvieres do not proffer a specific warning that DePuy should have included. At most, the Rouvieres appear to be arguing that DePuy should have alerted Dr. Buly to the impingement risk. But even if we presume that such a warning would have been heeded, in the absence of any evidence of what such a warning would have said and that it would have told Dr. Buly of anything significant he did not already know, the Rouvieres would still need evidence that Dr. Buly would have done something differently as a result.

At trial, the Rouvieres would bear the burden of proof. Thus, at the summary judgment stage, DePuy can seek summary judgment by "point[ing] to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). That is what DePuy did here. This shifted the burden of production to the Rouvieres to "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Id.* The Rouvieres have not done so with respect to proximate causation because there is no evidence upon which a reasonable juror could conclude that a different warning would have led to a different result. *See Sosna*, 748 N.Y.S.2d at 549 ("[I]t remains plaintiff's burden to prove that defendant's failure to warn was a proximate cause of his injury and this burden includes adducing proof that the user of a product would have read and heeded a warning had one been given.") (cleaned up).

Jodi Rouviere concedes that she relied entirely on Dr. Buly to choose the components in her hip replacement device. She proffers no basis upon which to dispute Dr. Buly's testimony that he was aware of the risk of impingement and that Rouviere had an elevated risk of impingement. It is thus not enough to show that Dr. Buly may not have known of the exact magnitude of the impingement risk and that additional warnings would have informed Dr. Buly



of those risks.  Rather, the Rouvieres had to proffer testimonial, documentary, or expert evidence regarding the magnitude of the risk and how it differed from the risk of which Dr. Buly was aware or that would otherwise allow a reasonable juror to infer that Dr. Buly would have done something different had he received different warnings.  *See Adeghe*, 2017 WL 3741310, at *7 (granting summary judgment on failure-to-warn claim because the plaintiff "cites no direct evidence, such as the testimony from his doctors, that Plaintiff would not have been prescribed Risperdal in the same manner if the warning were more extensive . . . [n]or does Plaintiff adduce any evidence suggesting that a physician balancing the risks of Risperdal-induced gynecomastia against the benefits of Risperdal would conclude that Risperdal should not have been prescribed to Plaintiff").  There is simply no such evidence in the record, so the Rouvieres have not met their summary judgment burden of production as to this theory of proximate causation.

    **b.  Whether different warnings by DePuy would have led Dr. Buly to give additional warnings to Rouviere, leading Rouviere not to consent to the surgery**

The Rouvieres' alternative theory of proximate causation is based not on Dr. Buly's choice of components but on Jodi Rouviere's choice to undergo the surgery.  The Rouvieres argue that additional warnings by DePuy would have resulted in additional warnings by Dr. Buly to Jodi Rouviere, and that, had she received these warnings, Rouviere would not have consented to the surgery.  This theory rests on three premises: (a) that Dr. Buly did not fully warn the Rouvieres about the risk of component impingement and the presence of toxic metals; (b) that, had DePuy given Dr. Buly more robust warnings, he would have in turn given more robust warnings to Rouviere about impingement, toxic metals, and metallosis; and (c) that, upon hearing those warnings, Rouviere would not have consented to the surgery.

Even assuming that the first premise is correct, the Rouvieres proffer no evidence as to the second premise—that additional warnings by DePuy would have led Dr. Buly to give

additional warnings to Jodi Rouviere.  As previously discussed, there is no evidence that additional warnings about impingement would have changed Dr. Buly's choice of components. The same lack of evidence applies to Dr. Buly's choice of warnings.  The Rouvieres point to no evidence that additional warnings from DePuy would have resulted in a different conversation between Dr. Buly and Jodi Rouviere concerning the risks of impingement.

The same result follows for the Rouvieres' claim that if DePuy had disclosed to Dr. Buly that the stem contained toxic metals, Dr. Buly would have relayed that information to Jodi Rouviere.  That is partially because Dr. Buly testified to the exact opposite:  When presented with the list of metals in DePuy's stem, he testified that this knowledge would not have affected his choice of components or his choice of warnings.  *See* Dkt. No. 316-1 at 280–89; *see also, e.g., id.* at 282 (Question: "If you were aware in August of 2012 that trace amounts of lead, here 30 parts per million max, were permitted and in HA coating, would you have recommended a different stem for Jodi Rouviere?"  Answer: "No."); *id.* at 282–83 (Question: "If you were aware in August of 2012 that trace amounts of lead, again, 30 parts per million, were allowed in the HA coating, would you have given any different warning to Jodi Rouviere?"  Answer: "No.").[8]  It is also because there is nothing in the facts and circumstances or in the nature of the unwarned risk

---

[8] Because the Rouvieres have not adduced evidence as to the second premise of this proximate-cause theory, the Court need not address the third premise—that Rouviere would not have consented to the surgery had she been given additional warnings. The Rouvieres' brief states that, had Jodi Rouviere been made aware of the impingement risk or of the existence of toxic metals, she would not have consented to the surgery.  But neither statement is accompanied by a citation to the record.  *See* Dkt. No. 233 at 33, 41.  And while Jodi Rouviere submitted a detailed declaration about her pre-surgery discussions with Dr. Buly, nowhere in that declaration does she state that she would not have consented to the surgery had she been given additional warnings.  *See* Dkt. No. 231-13.  Rouviere's deposition testimony arguably says that she would not have consented to the surgery had she known of the risk of metal wear, but it does not say that she would not have consented to the surgery had she just been notified of the exact metal contents of the DePuy stem.  *See* Dkt. No. 316-6 at PDF pp. 329–32.

**SA-58**

that could lead a jury to conclude that Dr. Buly would have given additional warnings. In its Local Civil Rule 56.1 statement, DePuy states that "Dr. Buly testified that after reviewing these material specifications he would continue to use the DePuy Summit Stem and Biolox Delta ceramic head and that he did not see any reason to provide any new or additional warnings to his patients." Dkt. No. 227 ¶ 65. The Rouvieres' response points to no evidence undermining the veracity of Dr. Buly's statement, nor does it offer any evidence that a reasonable surgeon would have reached a different conclusion.

In sum, the Rouvieres proffer no evidence that additional warnings by DePuy would have led Dr. Buly to choose different components or to give additional warnings to Jodi Rouviere. Thus, while the Rouvieres have adduced evidence as to the inadequacy of DePuy's warnings, they have not met their burden to adduce evidence of proximate causation. Summary judgment is therefore granted for DePuy on the Rouvieres' negligence and strict-products-liability claims (counts one and two) to the extent they are based on a failure-to-warn theory.

**F.    The Loss-of-Consortium Claim**

Andre Rouviere's loss-of-consortium is derivative of Jodi Rouviere's claims. Since DePuy is entitled to summary judgment on Jodi Rouviere's claims, it is entitled to summary judgment on the loss-of-consortium claim as well. *See Griffin v. Garratt-Callahan Co.*, 74 F.3d 36, 40 (2d Cir. 1996) ("[S]ince none of Mr. Griffin's claims survive, Mrs. Griffin's derivative claims alleging loss of consortium must also be dismissed.").

**CONCLUSION**

The Rouvieres' objection to Magistrate Judge Aaron's orders at Docket Nos. 232 and 266 is OVERRULED. The Rouvieres' motion to supplement the summary judgment record is GRANTED insofar as it seeks to include the supplemental Gannon and Bobst reports in the

38



record but is DENIED insofar as it seeks additional briefing.  DePuy's motion for summary

judgment is GRANTED as to all claims against it.

The Clerk of Court is respectfully directed to close Docket Nos. 178 and 308 and dismiss

DePuy from this case.

SO ORDERED.

Dated: September 17, 2021
        New York, New York

_____
LEWIS J. LIMAN
United States District Judge

**SA-60**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
:
JODI ROUVIERE and ANDRE ROUVIERE,                    :
:
Plaintiffs,                :
:
-v-                          :
:
HOWMEDICA OSTEONICS                                :
CORPORATION d/b/a STRYKER                           :
ORTHOPAEDICS,                                       :
:
Defendant.              :
------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/05/2022
```

18-cv-04814 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

In 2012, Jodi Rouviere ("Rouviere") underwent hip replacement surgery and, as part of that surgery, was implanted with a device that combined components made by two companies, one of which is Howmedica Osteonics Corp. (the "Defendant"). Rouviere alleges that the two components impinged on one another, resulting in the release of toxic metal debris into her body. Based on alleged injuries she sustained as a result of the release of this metal debris, Rouviere brings claims for negligence, strict products liability, breach of express warranty, and breach of implied warranty against Defendant. Her spouse, Andre Rouviere ("Mr. Rouviere," and with Rouviere, "Plaintiffs"), brings a claim for loss of consortium against the Defendant. Dkt. No. 26.

Defendant now moves for summary judgment based on the statute of limitations, arguing that Rouviere's claims are time-barred and Mr. Rouviere's loss-of-consortium claims should be dismissed as derivative. Dkt. No. 332. For the following reasons, the motion for summary judgment is granted.

**SA-61**

## BACKGROUND

The following facts, which are largely drawn from the parties' Local Rule 56.1

statements of facts, Dkt. Nos. 333, 334, 341-1, 348, are undisputed unless otherwise indicated.[1]

Rouviere injured her right hip during an accident in her kitchen in July 2009.  Joint 56.1

Statement ¶ 1.  Rouviere reported right hip pain following the accident; she wore a brace on her

right leg, could barely walk, often used a wheelchair, and could not climb up stairs.  P's 56.1

Counterstatement ¶ 36; D's Response to 56.1 Counterstatement ¶ 36.  After the accident,

Rouviere underwent a number of arthroscopic procedures on her hips.  *Id.* ¶¶ 2–3.

Shortly after the third of these arthroscopic procedures, Rouviere was diagnosed with

Ehlers-Danlos syndrome, a connective tissue disorder.  Joint 56.1 Statement ¶ 3.  As a result of

her Ehlers-Danlos syndrome, Rouviere has suffered from neck, shoulder, back, and spinal cord

issues and underwent an anterior cervical discectomy and fusion in February 21, 2013.  P's 56.1

Counterstatement ¶¶ 40–42; D's Response to 56.1 Counterstatement ¶¶ 40–42.  Medical records

from April 2012 document that Rouviere's Ehlers-Danlos syndrome caused her shoulder to

dislocate, severe popping of her neck, and her hands to be almost totally impaired due to

subluxation of her thumbs.  Dkt. No. 346-7 at ECF p. 83.

On August 14, 2012, due to recurring pain in her right hip, Rouviere underwent a total

right hip replacement surgery at the Hospital for Special Surgery in New York, performed by Dr.

---

[1] Defendant filed a Rule 56.1 joint statement of undisputed facts, which Defendant states that it compiled after meeting and conferring with Plaintiffs about what material facts are not in genuine dispute.  Dkt. No. 333 ("Joint 56.1 Statement").  Defendant also submitted a Rule 56.1 statement of undisputed facts in support of its motion for summary judgment, which is largely identical to the Joint 56.1 Statement, except it includes two additional paragraphs.  Dkt. No. 334 ("D's 56.1 Statement").  Plaintiffs submitted a response to D's 56.1 Statement as well as a counterstatement of facts (Paragraphs 36 to 83).  Dkt. No. 341-1 ("P's 56.1 Counterstatement").  Defendant submitted a response to P's 56.1 Counterstatement.  Dkt. No. 348 ("D's Response to 56.1 Counterstatement").

**SA-62**

Robert Buly.  Joint 56.1 Statement ¶ 4.  As part of that surgery, Dr. Buly implanted a DePuy titanium femoral stem and ceramic head, as well as a Stryker MDM ® liner and insert and acetabular cup; the Stryker device is made and sold by Defendant.  *Id.* ¶ 5.

Upon implementation, Rouviere alleges that she suffered injury, physiological instability, toxicity, and toxic result from the interaction of the devices, although the parties dispute when exactly Rouviere became aware of the injuries.  *Id.* ¶ 6; *see* P's 56.1 Counterstatement ¶ 6.  On multiple occasions in September 2012, Rouviere experienced extreme dizziness, vertigo, nausea, and vomiting and went to the Emergency Room on September 11, 2012 as a result of these symptoms.  Joint 56.1 Statement ¶ 7.  In November 2012, Rouviere complained to her osteopath of increasing right hip pain as well as "searing, shooting pain down the right hip."  *Id.* ¶ 8. Plaintiffs also alleged in their amended complaint that by the beginning of 2013, Rouviere "experienced pain and loss of range of motion."[2]  *Id.* ¶ 9 (quoting Dkt. No. 26 ¶ 209).  Further, as 2013 progressed, Rouviere's health declined, and she suffered more pain, instability, and less function in her right hip, her heart would start beating harder, and her body felt tired.  *Id.* ¶ 10.

In October 2013, Rouviere was treated by a neurologist, Dr. Brad Herskowitz, after she complained of headaches, heaviness in her arms and legs, an itchy head and face, an urgent need to urinate, and feeling like she had slowed down in general.  *Id.* ¶ 11.  The treatment records also state that Rouviere questioned whether she may have a multiple sclerosis-like disease.  P's 56.1 Counterstatement ¶ 11; *see* Dkt. No. 335-1 at 141–42.

---

[2] In their counterstatement, Plaintiffs do not contest this allegation, but state that "the allegation made in the Amended Complaint does not by itself indicate any knowledge by the plaintiff of any occurrence or condition prior to commencement of the action."  P's 56.1 Counterstatement ¶ 9.

**SA-63**

Treatment records from her osteopath, Dr. Mark Sandhouse, from mid-to-late 2013 indicate that Rouviere continued to suffer instability and pain in her right hip and displacement of the hip occasionally. Joint 56.1 Statement ¶ 12. In February of 2014, Rouviere had an appointment with a neurologist, Dr. Simon Starosta-Rubenstein, after she grew concerned with her "functional neurological decline." *Id.* ¶ 13.

On June 27, 2014, Rouviere told her physical therapist that she was suffering from, among other things, vertigo, lightheadedness, dizziness, double and blurred vision, tinnitus, nausea and vomiting, shaking episodes, tremors, changes in sleep patterns and appetite, numbness in her right leg, chronic pain, muscle pain at rest, speech difficulty, weakness in legs and arms, and heart palpitations. *Id.* ¶ 14. Doctor's notes related to that visit state that Rouviere believed that the "cause of the pain or condition to be Ehlers Danlos Syndrome." Dkt. No. 346-7.

Due to recurring incidents of instability of her right hip, Rouviere was admitted to the hospital on May 17, 2015. *Id.* ¶ 15. The admission records state that, in addition to instability of the right hip, Rouviere had been having problems with temperature regulation, tremors, blurred vision, cognitive impairment, dizziness, and gaited instability for the previous eight months. *Id.* The doctor's notes for the visit also state:

> Chief Complaint: Lower extremity pain. . . . She has had difficulty walking. . . . 43 y/o F with a significant surgical history of Rt hip replacement. . . . The pt was taken to Broward general hospital where x-rays were done and they revealed no fractures or dislocations. Even though the pt wasn't able to walk, she was discharged home with outpatient orders for an MRI of the rt hip. MRI was done it showed that the pt has anatomy distortion of the hip, with diffuse metal artifact present with no evidence of fracture or dislocation.

Dkt. No. 335-15. Rouviere's notes related to this visit dated May 18, 2015 state: "My hip mispositions again. I cannot walk and am in excruciating pain. I am admitted to Doctor's

4

**SA-64**

Hospital (Coral Gables, FL) for 6 days of testing as I believe my unstable hip and neurological symptoms could be relational [sic] to metallosis." *Id.*; *see* Dkt. No. 335-16.

In the amended complaint, Plaintiffs allege that in May 2015, Rouviere's blood was tested and demonstrated "highly elevated Chromium level of 0.9 [mcg/L], Arsenic of [mcg/L] 5 . . . Plaintiff has no source of exposure to chromium and cobalt and other metals that would account for her elevated blood levels of chromium or cobalt and other metals other than the subject product." Joint 56.1 Statement ¶ 16. Defendant claims that these blood test results were received on May 18, 2015, although Plaintiffs claim that Rouviere did not receive the results before she left the hospital and did not know what happened to the metal test. D's 56.1 Statement ¶ 17; P's 56.1 Counterstatement ¶ 17.

On May 21, 2015, Rouviere met with Dr. Carlos Alvarado, an orthopedic surgeon, because her hip had displaced so many times and would get stuck and she was having "so many" systemic issues. D's 56.1 Statement ¶ 18 (claiming that Rouviere went to see Dr. Alvarado); P's 56.1 Counterstatement ¶ 17 (claiming that Dr. Alvarado came to see Rouviere at the hospital).

On November 11, 2016, Rouviere underwent a partial revision surgery, performed by Dr. Alvarado, to remove and replace the two implanted devices. Joint 56.1 Statement ¶ 19. The surgeon for the revision surgery found that the DePuy titanium stem had impinged upon the Stryker MDM ® cobalt chrome liner resulting in a notch in the neck of the titanium stem. *Id.* He also found "a significant amount of grayish brown soft tissue consistent with metal debris," which was indicative of metallosis. *Id.* The surgeon later told Rouviere that she was "covered in metallosis" and that she had "pseudotumors consistent with damage to the tissue." *Id.* ¶ 20.

After this procedure, Rouviere underwent two additional revision surgeries in February 2017 and May 2017 to remove and replace various components in her right hip. *Id.* ¶ 21.

5

Eventually, in October 2017, a procedure was performed in which all of the hip components were removed.  *Id.* ¶ 22.

In this action, Rouviere claims that, due to the implantation of Defendant's device, she has suffered injuries including physiological instability, pain, swelling, inflammation, adverse tissue reaction, necrosis, pseudotumor, metallosis, and toxicity resulting from metal debris generated by her hip components as well as decreased mobility of the hip.  *Id.* ¶ 23.  In her amended complaint, she alleges that by reason of Defendant's tortious acts, she "has suffered and/or is at an extremely high risk of suffering serious and dangerous side effects, including but not limited to severe pain and suffering, the need for additional surgery, as well as other severe and permanent health consequences."  Dkt. No. 26 ¶ 196; *see also id.* ¶¶ 270, 289, 313, 324, 335, 348, 371, 382, 393.  She alleges that she "has been severely and permanently injured and/or has been exposed to risk of severe and permanent injury, and has and will require more constant and continuous medical monitoring and treatment than prior to her implantation of Defendants' Summit Tapered Hip System and its stem."  *Id.* ¶ 198.  Plaintiffs' experts identify the following injuries as caused by metal debris released from her 2012 implants: tissue damage and necrosis, metallosis, chronic fatigue, nausea, headaches, weakness, dizziness/vertigo, cognitive impairment, hip and other joint and muscle pain, tachycardia, dry eyes/blurred vision, and other immunological and neurological symptoms.  Joint 56.1 Statement ¶ 24.

## PROCEDURAL HISTORY

Plaintiffs initiated this lawsuit on May 31, 2018 by filing a complaint against Defendant as well as Depuy International, Limited, DePuy Orthopaedics, Inc. ("DePuy"), Depuy Products, Inc., Johnson & Johnson Services, Inc., Johnson & Johnson, Inc., Stryker Corporation, and Stryker Sales Corporation.  Dkt. No. 1.  On October 19, 2018, Plaintiffs filed the operative, amended complaint against the same entities.  Dkt. No. 26.  That amended complaint seeks

SA-66

damages for severe and permanent personal injuries including elevated blood levels of chromium, chromium toxicity, elevated blood levels of cobalt, cobalt toxicity, titanium, titanium toxicity, inflammation, pain, swelling, loss of range of motion, surgical removal and revision of hip replacement system, hip explant, pain and suffering, economic loss and permanent disability, all of which Rouviere allegedly sustained as a consequence of being impacted by devices manufactured and sold by the defendants.  *Id.* ¶ 1.

In December 2018, Plaintiffs voluntarily dismissed their claims against Stryker Corporation and Stryker Sales Corporation, DePuy Products, Inc., DePuy International, Limited, Johnson & Johnson, and Johnson & Johnson Services, Inc.  Dkt. Nos. 43–44, 51, 52.  On January 7, 2019, Defendant filed an answer to the amended complaint, asserting that Plaintiffs' claims are barred by the applicable statute of limitations.  Dkt. No. 54 at ECF p. 38.

On September 17, 2021, this Court granted summary judgment in favor of DePuy on all counts, including because Plaintiffs offered no expert testimony in support of their defective-design claim against DePuy and Plaintiffs failed to adduce evidence as to proximate causation in support of their failure-to-warn claim against DePuy.  Dkt. No. 318 at 7.  Thus, Defendant was left as the only remaining defendant in the case.

During a conference on February 17, 2012, the Court directed Defendant to file a motion for summary judgment based only on the statute of limitations by March 18, 2022, and noted that other summary judgment arguments and *Daubert* issues would be preserved pending the outcome of that motion.

On March 18, 2022, Defendant filed its motion for summary judgment based on the statute of limitations along with supporting papers.  Dkt. Nos. 332–36.  On May 23, 2022, Plaintiffs filed their opposition to Defendant's motion for summary judgment, as well as

supporting papers.  Dkt. No. 341.  On May 27, 2022, Plaintiffs filed a motion to file certain

exhibits or portions of the exhibits under seal,[3] as well as a revised declaration with exhibits in

support of its opposition to summary judgment.  Dkt. Nos. 345–46.  Defendant filed their reply

memorandum of law in support of summary judgment as well as supporting documentation on

June 20, 2022.  Dkt. Nos. 347–49.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for

these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n

issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether

there are any genuine issues of material fact, the Court must view all facts "in the light most

favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir.

---

[3] Plaintiffs seek leave to file certain exhibits under seal.  Dkt. No. 345.  Plaintiffs stated that these exhibits should be sealed as they contain material set forth in the protective order between the parties.  *Id.*  "Confidentiality agreements alone are not an adequate basis for sealing."  *Metcalf v. TransPerfect Translations Int'l, Inc.*, 2022 WL 2116686, at *1 (S.D.N.Y. June 13, 2022). "Material designated as Confidential by a protective order might not overcome the presumption of public access once it becomes a judicial document" and "[d]ocuments submitted in support of or opposition to a dispositive motion are judicial documents."  *Id.* (internal quotation marks and citations omitted).  A party seeking to seal material subject to protective order must therefore justify why the presumption of public access over judicial documents should be overcome.  *Id.* Here, Plaintiffs have failed to explain why sealing of this material is appropriate under the factors set forth in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006).  For this reason, the motion to seal is denied without prejudice to a revised motion to be filed within 14 days of the date of this Order that explains why "sealing (1) is necessary 'to preserve higher values,' and (2) 'is narrowly tailored to serve that interest.'"  *Metcalf*, 2022 WL 2116686, at *1 (quoting *Lugosch*, 435 F.3d at 120).  In the absence of such a timely-filed motion, the Court will unseal the materials.

SA-68

2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

"[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)). Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The non-moving party must also demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).[4]

---

[4] The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented. Any party moving for summary judgment must "annex[ ] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." L.R. 56.1(a). Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if



**DISCUSSION**

Defendant argues that Plaintiffs' products liability claims arising out of an August 14, 2012 right total hip replacement surgery are barred by the three-year statute of limitations and that, because such claims are time-barred, the derivative loss-of-consortium claim asserted by Mr. Rouviere is also subject to dismissal.

## I.      Product Liability Claims

To determine whether Plaintiffs' personal injury claims are barred by the statute of limitations, the Court must first decide what statute of limitations applies to Plaintiffs' products liability claims.  The parties agree that New York law governs this question and that a three-year statute of limitations applies.  Dkt. No. 336 at 6–7; Dkt. No. 341 at 10; *see Vuksanovich v. Airbus Americas, Inc.*, 2022 WL 2274543, at *6 (S.D.N.Y. June 23, 2022)) ("Under New York law, the general limitations period for personal injury claims is three years." (citing N.Y. C.P.L.R. § 214(5))).  The parties, however, dispute exactly when that three-year statute of limitations began to accrue.

First, the parties dispute whether N.Y. C.P.L.R. 214-c(2)—which provides a specific accrual rule for personal injury caused by the "latent effects of exposure" to any substance— applies to Plaintiffs' product liability claims.  C.P.L.R. 214-c(2) provides that where a person suffers personal injury from the "latent effects of exposure to any substance or combination of substances, in any form," the three-year limitations period runs "from the date of discovery of

---

necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  L.R. 56.1(b).  All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible."  L.R. 56.1(d).  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  L.R. 56.1(c).

the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier." C.P.L.R. 214-c(2). This is distinct from the general accrual rule for personal injury suits caused by the malfunctioning of a device, which runs "from the date of injury resulting from malfunction, not from the date of implantation of the device—unless implantation and malfunction occur at the same time." *Guisto v. Stryker Corp.*, 293 F.R.D. 132, 135 (E.D.N.Y. 2013). "The goal of the Legislature in adopting CPLR 214-c was to 'provide relief to injured New Yorkers whose claims would otherwise be dismissed for untimeliness simply because they were unaware of the latent injuries until after the limitations period had expired.'" *Matter of New York Cnty. DES Litig.*, 678 N.E.2d 474, 478 (N.Y. 1997) (citation omitted).

In a few sentences, Defendant appears to argue that C.P.L.R. 214-c(2) does not apply to Plaintiffs' personal liability claims because, according to Plaintiffs, the "mechanical problem" with the devices "caused pain and instability" in Rouviere's hip immediately upon implementation; in Defendant's view, then, this is not a case in which the effects of the exposure were "latent." Dkt. No. 336 at 17. In support of this argument, Defendant points to an interrogatory response from Plaintiffs stating that "[t]he device caused injury upon implementation, physiological instability, toxicity and toxic result over time." *Id.*; Dkt. No. 335-3 at ECF p. 6. Plaintiffs respond that the "implanted hip admittedly did not cause injury on the date it was implanted regardless of whether the device was otherwise defective." Dkt. No. 341 at 12.

The Court agrees with Plaintiffs that C.P.L.R. 214-c(2) applies to Plaintiffs' product liability claims. To begin, the evidence supports that there was a latency period before Rouviere discovered the alleged injury. The New York Count of Appeals has stated that "even effects

11

SA-71

concealed for a few hours may be 'latent' within the meaning of the statute," *Giordano v. Mkt. Am., Inc.*, 941 N.E.2d 727, 731 (N.Y. 2010), and, here, the evidence indicates that the effects of the implantation were latent for at least a month.  Rouviere first identifies suffering injuries allegedly attributable to her exposure to the device around September 11, 2012—approximately one month after the implantation—when she began to experience "a spinning feeling paired with dizziness, nausea, and vomiting and was taken to the Emergency Room at Baptist Hospital for vertigo."  Dkt. No. 335-4 at 3; *see* Joint 56.1 Statement ¶ 7.  Plaintiffs' interrogatory response— stating that "[t]he device caused injury upon implementation"—does not compel a contrary conclusion.  Dkt. No. 335-3 at ECF p. 6.  Although the interrogatory response generally states that the device caused injury "upon implementation," it does not state that the injury occurred *immediately* upon implementation or, more important, state that the injury was patent.  A patient can be injured without the injury being discovered.  That is the point of the New York statute. The interrogatory is thus silent as to whether the injury was "latent" for some period of time prior to its discovery, and Defendant points to no other evidence that the effects of which Plaintiffs complain were immediately apparent to Rouviere.  *See BJB Ltd. v. iStar Jewelry LLC*, 533 F. Supp. 3d 83, 91 (E.D.N.Y. 2021) (defendant bears the burden of proof on a statute of limitations defense).

To the extent Defendant is arguing that C.P.L.R. 214-c(2) does not apply because Rouviere suffered injury from a "mechanical problem" rather than "exposure to a[] substance," this argument is also unavailing.  Dkt. No. 336 at 17.  The heart of Plaintiffs' claims is that the impingement of the two component devices and the resulting friction caused the release of metal debris and ions that, in turn resulted in metallosis and other conditions that caused pain, swelling, inflammation, adverse tissue reactions, and a decrease in range of motion.  Dkt. No. 26 ¶¶ 126–

12

28; *see also* Dkt. No. 233 at 3.  Rouviere's injuries thus allegedly resulted from exposure to a toxic substance, not merely a mechanical problem: Plaintiffs claim that the DePuy titanium stem impinged with the Stryker cobalt-chrome liner, releasing toxic metals into Rouviere's body, which, in turn and over time, caused various ailments in Rouviere.  Joint 56.1 Statement ¶ 19; Dkt. No. 336 at 1.  These allegations, if true, are precisely the type with which the New York legislature was concerned when it passed C.P.L.R. 214-c(2).  *See Giordano*, 941 N.E.2d at 731 ("The Legislature's concern when it enacted the statute was the problems raised by toxic tort cases in which the latency of a substance's effect could prevent the plaintiff from bringing a timely lawsuit.").  It is also apparent from the statutory text that C.P.L.R. 214-c(2) applies to claims involving the malfunctioning of an implanted device.  "Exposure" is defined earlier in C.P.L.R. 214-c to mean "direct or indirect exposure by absorption, contact, ingestion, inhalation, *implantation* or injection."  C.P.L.R. 214-c(1) (emphasis added).  The use of the phrase "exposure by . . . implantation" specifically envisions that a party may be exposed to a substance causing injury in the manner alleged here.  *See, e.g.*, *Prohaska v. Sofamor, S.N.C.*, 138 F. Supp. 2d 422, 429 (W.D.N.Y. 2001) (applying C.P.L.R. 214-c(2) to claims for physical harm resulting from defects in an internal fixation system implanted in the spine).

The cases that Defendant cite in favor of its argument that C.P.L.R. 214-c(2) does not apply to Plaintiffs' claims are inapposite.  In *Baker v. Stryker Corp.*, 770 F. App'x 12 (2d Cir. 2019), the plaintiff's pain "began almost immediately after his" operation, *id.* at 14–15, and there was no allegation that the injury arose "from latent exposure to a substance," *id.* at 15.[5] Similarly, in *Guisto*, 293 F.R.D. 132, plaintiffs' claims "concern[ed] physical pain and

---

[5] The Second Circuit also noted in *Baker* in a footnote that "even if C.P.L.R. § 214-c did apply, Baker's personal injury claims would still be untimely."  *Id.* at 15 n.1.

**SA-73**

discomfort resulting from a defective or malfunctioning device" and they "made no allegations of developing any condition or contracting any disease because of the device." *Id.* at 137. In addition, the plaintiffs in *Guisto* asserted "that the implant was ill-fitting and caused her immense pain from the time of implantation." *Id.* In this case, as noted, Rouviere complains not of physical pain or discomfort resulting from the implantation of the device, but of a condition that she developed as a result of exposure to toxic metal debris from the devices. For these reasons, the Court finds that the accrual rule in C.P.L.R. 214-c(2) applies to Plaintiffs' claims.

Because C.P.L.R. 214-c(2) applies, the next issue is when the "discovery of the injury" occurred for purposes of the accrual of the three-year statute of limitations. C.P.L.R. 214-c(2).

Defendant argues that discovery of the injury occurred shortly after the implant surgery in 2012 when Rouviere began to exhibit symptoms, allegedly caused by the metal debris released from the 2012 implants. Dkt. No. 336 at 8–9. In arguing that discovery of the injury occurred around late-2012 to early-2013, Defendant points to: (i) Plaintiffs' expert opinions, which rely on Rouviere's injuries having first occurred in 2012; (ii) Plaintiffs' own testimony and doctor records indicating that she started to suffer symptoms, including dizziness, vertigo, instability, and pain, beginning in late-2012 and throughout 2013; (iii) Plaintiffs' judicial admission in the amended complaint that "[b]y the beginning of 2013, she experienced pain and loss of range of motion"; (iv) Plaintiffs' interrogatory responses that Rouviere saw a doctor in March 2013 regarding vision problems, eye pain, sinus pressure, and headaches; and (v) deposition testimony from Rouviere that she saw the most decline in her health occur in 2013, when it started to "tak[e] a lot for [her] to do the normal things that [she] was doing." *Id.* at 8–13. Defendant argues that these symptoms only became more pronounced in 2014, pointing to evidence, among

14

others, that Rouviere visited a neurologist in February 2014 due to concerns about "functional neurological decline." *Id.* at 13.

Plaintiffs respond that the issue of when exactly the injury was discovered is a question of fact unsuitable for summary judgment. Dkt. No. 341 at 19. Plaintiffs make several arguments in support of this point. Plaintiffs note that Rouviere suffered numerous ailments and complaints related to a number of different parts of her body, "not just her hip, making it difficult, to say the least, for plaintiff or anyone else to parse through which complaints could reasonably be related to the implant malfunction." *Id.* at 15. Plaintiffs also argue that Rouviere's symptoms were varied and random and thus insufficient to trigger the running of the statute of limitations. *Id.* at 21–22. Plaintiffs further state that Rouviere has had a complex medical history, with symptoms occurring before and continued after her 2012 surgery—which does not lend itself to isolating a specific date prior to the revision surgery at which time Plaintiff's injuries can be traced to the implantation malfunction. *Id.* at 22. For these various reasons, Plaintiffs argue that the accrual date did not run until the revision surgery in November 2016. *Id.* Plaintiffs, however, note that if the Court finds that "the injury related to the malfunction manifest[ed] itself prior to May 31, 2015, it is submitted that the only dates which might lend themselves to such a finding would be May 17, 2015, May 18, 2015 and May 21, 2015," which are the dates on which Rouviere first opined that her symptoms were related to metallosis and her blood was tested. *Id.* at 15–16. Plaintiffs note that if the claims accrued on the last of these three dates (*i.e.*, May 21, 2015), Plaintiffs' claims would not be untimely as Mr. Rouviere attempted to file the initial complaint on May 21, 2018. *Id.* at 1–2, 16.

The meaning of the phrase "discovery of the injury" in C.P.L.R. 214-c(2) has been explored at length by courts in this Circuit as well as New York State courts. The key case is

15

SA-75

*Matter of New York County DES Litigation*, in which the New York Court of Appeals first addressed the meaning of the phrase. 678 N.E.2d 474. In that case, the plaintiff experienced a number of reproductive difficulties and ailments which were initially misdiagnosed; she ultimately learned that her ailments may have been related to her mother's ingestion of diethylstilbestrol ("DES"), while pregnant with the plaintiff. Upon that discovery, she sued the manufacturers of DES, claiming that they were responsible for her reproductive ailments. Several of the defendants moved for summary judgment and the court ruled in their favor, directing the complaint to be dismissed as time-barred under C.P.L.R. 214-c(2). *Id.* at 475–76.

The New York Court of Appeals accepted defendants' argument that the statute of limitations begins to run in a latent exposure case "when the injured party discovers the primary condition on which the claim is based." *Id.* at 475. In doing so, the court rejected plaintiff's argument that the limitations period would begin to run only when the plaintiff was aware that the injury was "caused by an outside, nonbiological source"; in other words, that the statute of limitations could not begin to run if the plaintiff knew "neither of the cause of the symptom nor of the very fact that th[e] symptoms have a nonnatural cause." *Id.* at 477.

Although noting that the "interpretation plaintiff urges has some superficial appeal, since it would benefit potential claimants whose symptoms, like plaintiff's, are ambiguous and are not always associated with exposure to a foreign substance," the New York Court of Appeal rejected plaintiff's reading of the statute, finding that its "construction is out of harmony with the statutory design and is unsupported by the provision's legislative history." *Id.* The court recognized that the rule it was adopting would result in the statute of limitations beginning to run before the plaintiff knew that the harm she suffered was "caused by an outside, nonbiological source." *Id.* Indeed, Judge Smith, in dissent, noted that the rule would burden plaintiffs "with an

16

**SA-76**

expiring Statute of Limitations when the only knowledge in their possession [wa]s the existence of an abnormal physical condition," and "disregard the diligence exercised by plaintiffs in attempting to discover the causes of their medical problems." *Id.* at 481 (Smith, J., dissenting). However, the Court of Appeals majority noted that a separate provision in C.P.L.R. 214-c addresses scenarios where a plaintiff "was aware of the 'injury' itself but there was a delay in the discovery of its 'cause'" and requires certain "statutorily prescribed conditions" to be satisfied to invoke this provision.[6] *Id.* at 477. Thus, discovery of the injury in C.P.L.R. 214-c(2) must have a different meaning than discovery of the cause of the injury. In addition, the court stated that "the distinction plaintiff advances"—between discovery that symptoms have a nonbiological cause and the precise identity of that nonbiological cause—"is more semantic than real." *Id.* The court reasoned that:

> The knowledge that particular symptoms are attributable to an outside cause is almost invariably coupled with an awareness of the identity of that cause. As a practical matter, physicians do not diagnose medical problems as having a nonbiological cause in a vacuum. It is usually only after the discovery by

---

[6] That provision, *i.e.*, C.P.L.R. 214-c(4), states that:

> where the discovery of the cause of the injury is alleged to have occurred less than five years after discovery of the injury or when with reasonable diligence such injury should have been discovered, whichever is earlier, an action may be commenced or a claim filed within one year of such discovery of the cause of the injury; provided, however, if any such action is commenced or claim filed after the period in which it would otherwise have been authorized pursuant to subdivision two or three of this section the plaintiff or claimant shall be required to allege and prove that technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury had not been discovered, identified or determined prior to the expiration of the period within which the action or claim would have been authorized and that he has otherwise satisfied the requirements of subdivisions two and three of this section.

C.P.L.R. 214-c(4). In this case, both parties agree—although for different reasons—that this provision does not save Plaintiffs' claims and thus the Court does not address it. *See* Dkt. No. 336 ("The 'Unknown Cause' exception of CPLR §214-c(4) does not apply."); Dkt. No. 341 ("Plaintiff does not dispute that CPLR 214-c(4) does not apply but not for the reasons set forth by defense.").

17



> researchers of the relationship between a particular toxic substance and a particular set of symptoms, such as the now known relationship between thalidomide and certain birth defects or between asbestos and certain lung diseases, that diagnosticians connect the observed symptoms to a nonbiological, outside cause.

*Id.* at 477–78.  The court further stated that: "CPLR 214-c(2)'s reference to 'discovery of the injury' was intended to mean discovery of the condition on which the claim was based" and that "nothing more is [] apparent from the legislative history of the provision."  *Id.* at 478.  Specifically, the court stated:  "It is apparent from this history that, in enacting a new 'discovery' rule for the commencement of toxic torts, the Legislature had in mind only the discovery of the manifestations or symptoms of the latent disease that the harmful substance produced."  *Id*.  For these reasons, the court concluded that the "time for bringing the action begins to run under the statute when the injured party discovers the primary condition on which the claim is based."  *Id.* at 475.  The court noted that a different rule "would depend on such fortuitous circumstances as the medical sophistication of the individual plaintiff and the diagnostic acuity of his or her chosen physician."  *Id.* at 479.

Since the majority's holding in *Matter of New York County DES Litigation*, courts have repeatedly held that claims are time barred under C.P.L.R. 214-c(2) where a plaintiff suffered symptoms of an illness more than three years prior to filing suit, regardless of whether the cause of those symptoms had been discovered.  For example, in *Vuksanovich*, the court dismissed a plaintiff's claims as untimely after finding that they accrued when she began experiencing serious illness, including pain, trouble breathing, and worsening eyesight, and were not tolled during the period in which the doctors were unable to "identify the cause of her symptoms."  2022 WL 2274543, at *7–8.  Similarly, in *Trisvan v. Heyman*, the court found that a plaintiff's claims were time-barred as the plaintiff admitted to suffering certain symptoms, including gaining close to a hundred pounds and suffering hypertension, by the usage of the drugs in 2003

18

SA-78

and did not file suit until 2015.  305 F. Supp. 3d 381, 389, 397 (E.D.N.Y. 2018).  In reaching its result, the court held that it was irrelevant that plaintiff's medical physician had not linked his side effects to the drugs at issue until 2015.  *Id.* at 389.  And, in *Whitney v. Quaker Chemical Corp.*, the New York Court of Appeals held that the plaintiff's symptoms which resulted in him making repeated visits to the hospital and the health center for treatment were sufficient to trigger the running of the statute of limitations.  683 N.E.2d 768, 769 (N.Y. 1997).  The court noted that "[n]either plaintiff's contention that his symptoms worsened and changed in 1991 nor the diagnosis of a doctor he first visited in September 1991 that substances other than the coolant caused his injury makes his claim timely."  *Id.*

It important to note that onset of *any* symptoms is not sufficient to trigger the statute of limitations under C.P.L.R. 214-c(2).  Instead, the symptoms must put plaintiff on notice of the "primary condition on which the claim is based."  *Matter of New York Cnty. DES Litig.*, 678 N.E.2d at 475; *see Grill v. Philip Morris USA, Inc.*, 653 F. Supp. 2d 481, 487 (S.D.N.Y. 2009) ("[T]he relevant inquiry for statute of limitations purposes is when the injured party became aware of the primary condition on which the plaintiff's claim is based.").  "New York courts have not established a bright-line rule for when symptoms or manifestations of a physical condition are sufficient to trigger" notice of the primary condition on which the claim is based, *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 211 (2d Cir. 2014), although the New York Court of Appeals cautioned in *Matter of New York County DES Litigation* that "there may be situations in which the claimant may experience early symptoms that are too isolated or inconsequential to trigger the running of the Statute of Limitations under CPLR 214-c(2)," 678 N.E.2d at 478 n.4.  Applying this general guidance, the court in *O'Halloran v. 345 Park Co.* found that a plaintiff's early symptoms were "too isolated or

19

SA-79

inconsequential to trigger the running of the Statute of limitations" where the plaintiff who brought an action to recover for toxic injuries allegedly caused by exposure to defendant's pain product only "missed two and a half days of work," and "neither sought medical attention nor filed a Workers' Compensation claim until" a later date.  675 N.Y.S.2d 55, 55 (1st Dep't 1998) (citation omitted).  On the other hand, the court in *Scheidel v. A.C. & S. Inc.*, rejected plaintiff's argument that the symptoms of the decedent (who was exposed to asbestos and developed asbestosis as a result) "were so generalized and episod[ic] that they did not constitute the primary condition upon which the claim was based."  685 N.Y.S.2d 829, 831 (3d Dep't 1999).  The court stated that the "record reveals that decedent . . . experienced multiple manifestations of his condition or injury which affected virtually all physical activity and prompted him to change the nature of his employment" and thus was "not a situation in which decedent's symptoms were so isolated or inconsequential that a reasonably diligent person would not attribute them to an injury or disease."  *Id.* (further holding that "the fact that his illness was not diagnosed until November 1994 and he may not have been fully aware that the cause of his injury was an exposure to asbestos is not dispositive").

Defendant has established that there is no genuine issue of material fact that Plaintiffs' personal injury claims accrued more than three years prior to May 2018, when this lawsuit was brought, and therefore the claims are time barred.  In the years leading up to May 2015, Rouviere began to experience exactly those symptoms that she now seeks damages for and attributes to the implantation of Defendant's device.  In September 2012, Rouviere went to the emergency room because she was experiencing extreme dizziness and vertigo as well as nausea and vomiting.  Joint 56.1 Statement ¶ 7.  Even if those symptoms at the time could be deemed to be too "inconsequential" or "isolated" to be the "primary condition" on which Plaintiffs' claim is based,

**SA-80**

Rouviere testified at her deposition that by 2013 she felt like she saw "the most decline starting to happen" and experienced "[m]ore pain, more instability, less function" in her hip.  Dkt. No. 335-1 at ECF p. 13.  Rouviere further testified that in 2013 she was "receiving a lot of effects" such as her "heart would start beating harder," it was "taking a lot for [her] to do the normal things [she] was doing," "[e]xertion was exhausting for [her]," and "[her] body was tiring."  *Id.* at ECF pp. 13–14.  In 2013, Rouviere visited a neurologist due to symptoms including "heaviness in arms and legs, feeling like itching in her face and head, urinary urgency and hesitation," and "feel[ing] like she has slowed down in general" and questioned whether she had a disease such as multiple sclerosis.  *Id.* at ECF p. 15.  In 2014, at a physical therapy appointment, Rouviere reported feeling "shooting pain through her body" and that "she is getting worse" with "severe daily headaches" and extreme fatigue, Dkt. No. 335-14; at a neurosurgery appointment in that same year, Rouviere presented with "vertigo, dizziness, lightheadedness, tremors, the headache and neck pain, blurred vision at times on the left, visual flashes, vision halos, tinnitus, speech difficulties, hoarseness, choking, weakness of the arms and legs, nausea, imbalance, poor coordination, dysphagia, and dysautonomia manifest by palpitations," Dkt. No. 346-7 at ECF p. 12.  And, at the time of her visit to Dr. Alvarado in May of 2015, Rouviere again reported "poundings in [her] body" and head, blurred and double vision, "malaise," and an "[o]verall feeling of sickness."  *Id.* at ECF p. 18.  These symptoms map onto the injuries Plaintiffs' experts state that Rouviere experienced from Defendant's conduct, including "chronic fatigue, nausea, headaches, weakness, dizziness/vertigo, cognitive impairment, hip and other joint and muscle pain, tachycardia, dry eyes/blurred vision, and other immunological and neurological symptoms."  Joint 56.1 Statement ¶ 24.

21



Medical records also document that the impacts of these symptoms on Rouviere's life were immense in the years prior to the three-year period before Plaintiffs filed the complaint in this case. As one medical record from 2014 documents: "Notwithstanding the fact that she has been raising [] four children, she has been otherwise totally disabled. There was a cascade of injuries starting six years ago when she injured her hip . . . . Presently, with no activity and some pain medicine, her pain level is 6/10. With activity the pain is 9/10." Dkt. No. 346-7 at ECF p. 12. In 2014, Rouviere reported on a medical form that "living is a physical challenge," that she worked from her "bed," and that she suffered numerous symptoms including numbness of right leg, shaking episodes, tremors, headaches, blurred vision at times, double vision at times, ringing in ears, chronic pain, heart palpitations, poor coordination, speech difficulty, among other symptoms. Dkt. No. 346-7 at ECF pp. 36–37.

Thus, from this evidence, it is apparent that Rouviere knew of the condition on which her claim was based and that "virtually all of plaintiff's alleged symptoms emerged more than three years prior to her commencement of the action" on May 31, 2018.[7] *Bartlett v. Moore Bus. Forms, Inc.*, 2000 WL 362022, at *4–5 (N.D.N.Y. Mar. 30, 2000). Those symptoms, prior to

---

[7] Plaintiffs argue that the three-year period should be measured from May 21, 2018, which is when Plaintiffs state that Mr. Rouviere attempted to file the initial complaint but was unable to because he paid the fee with a personal check. Dkt. No. 341 at 1–2. That argument is without merit, but it is also immaterial. Mr. Rouviere, though appearing *pro se* on behalf of himself at the time he attempted to file the initial complaint, is also an attorney. Thus, he is entitled to no special solicitude. Dkt. No. 346-4 ¶ 1; *see Corbett v. City of New York*, 816 F. App'x 551, 553 (2d Cir. 2020); *Abraham v. Leigh*, 471 F. Supp. 3d 540, 553 (S.D.N.Y. 2020) ("[W]here, as here, an attorney represents herself in a proceeding, she is entitled to no special solicitude."). Moreover, a party claiming excusable neglect will almost always lose where a party "fail[s] to follow the clear dictates of a court rule." *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366–67 (2d Cir. 2003) (citation omitted). Plaintiffs do not detail any special circumstances why this general holding should not apply here. Finally, however, it is irrelevant whether the time runs back from May 21, 2018 or from May 31, 2018. Rouviere's symptoms manifested significantly prior to May 21, 2015 and by 2014, Rouviere described "living [as] a physical challenge" due to her symptoms. Dkt. No. 346-7 at ECF pp. 36–37.

**SA-82**

March 31, 2015, were also sufficiently continuous and sufficiently severe that they were not "so isolated or inconsequential that a reasonably diligent person would not attribute them to an injury or disease." *Id.* at *4; *see, e.g.*, *Cochrane v. A C & S, Inc.*, 1998 WL 642719, at *6 (S.D.N.Y. Sept. 18, 1998) ("[I]solated and generic symptoms of shortness of breath do not suffice in commencing the running of the statute of limitations."); *Cabrera v. Picker Int'l, Inc.*, 770 N.Y.S.2d 302, 303 (1st Dep't 2003) (finding symptoms too isolated or inconsequential to trigger statute of limitations where "[w]hile plaintiff complained of shortness of breath and had intermittent coughs, her physical activities were not affected"). The conditions significantly affected Rouviere's physical activity and quality of life over an extended period of time. Rouviere stated in 2014 that, due to her symptoms, living was a "physical challenge," and she repeatedly went to various doctors during this period in order to seek treatment for her symptoms and to have them diagnosed. Dkt. No. 346-7 at ECF pp. 36–37; *see generally* Dkt. No. 346-7. Courts have held that symptoms of this degree trigger the running of the statute of limitations under C.P.L.R. 214-c(2) as a matter of law. *See Braunscheidel v. Stryker Corp.*, 2013 WL 1337013, at *5 (N.D.N.Y. Mar. 29, 2013) (granting motion to dismiss where symptoms "consistently impacted Plaintiff's day-to-day life" and required "numerous appointments with a number of different doctors"); *Whitney*, 683 N.E.2d at 769 (granting summary judgment where "symptoms that afflicted plaintiff in 1989 led him to make repeated visits to the hospital and the health center for treatment"). They have also held that repeated complaints to doctors about symptoms are sufficient to trigger the running of the statute of limitations. *See Paesano v. Ethicon, Inc.*, 2022 WL 846899, at *6 (S.D.N.Y. Mar. 22, 2022).

It is true that there is evidence Rouviere did not begin to suspect that her symptoms were related to the implant malfunction until May 2015, and that her doctors did not determine that the

**SA-83**

devices at issue were the cause of those symptoms until November 2016 (when she underwent her partial revision surgery). Those facts make it understandable that she did not file suit prior to November 2016 (though it is more difficult to understand why she waited until May 2018). But the fact that the statute of limitations would start to run before Rouviere was aware that the ailments she was experiencing were due to the implanted devices or even before she might have known that those ailments had a nonbiologic clause is what *Matter of New York County DES Litigation* requires. For the three-year limitations period for toxic torts to start to run, a plaintiff need not know the cause of her injury or even know that the injury has a "nonbiological cause," *Whitney*, 683 N.E.2d at 768, and a doctor's misdiagnosis of a plaintiff's symptoms of that injury in the interim years does not toll the statute of limitations, *id.* at 769. *See also Scheidel*, 685 N.Y.S.2d at 831 ("[T]he fact that his illness was not diagnosed until November 1994 and he may not have been fully aware that the cause of his injury was an exposure to asbestos is not dispositive."); *see also Braunscheidel*, 2013 WL 1337013, at *4 (concluding that fact that plaintiff "saw numerous physicians, all of whom failed to diagnose chondrolysis as the root of his shoulder pain" was irrelevant to timeliness analysis). The New York Legislature did not "intend to make the running of the Statute of Limitations depend on claimants' subjective understanding of the etiology of their conditions." *Matter of New York County DES Litigation*, 678 N.E.2d at 479. As the New York Court of Appeals again held shortly after *Matter of New York County DES Litigation*, it is irrelevant that the plaintiff has no reason to believe that her injury has a nonnatural cause—it is sufficient that the Plaintiff have simply discovered the injury underlying his claim: "[a]ll that is necessary to start the limitations period is that plaintiff be aware of the primary condition for which damages are sought." *Whitney*, 683 N.E.2d at 769. A would-be plaintiff must, within the three-year period, receive a correct diagnosis of her other

24

than inconsequential, generalized, or isolated ailments lest she lose her claim even before she knew she had it.  Rouviere was aware prior to May 2015 of the injuries which she now claims were caused by Defendant's allegedly tortious acts.  That she was left in the dark as to its true cause does not save her claims.[8]

Plaintiffs nonetheless argue that this case is ill-suited for resolution at summary judgment as Rouviere has had a long and complex history of medical conditions and injuries, even prior to the 2012 hip surgery at issue, and "[t]he complexity of her physical condition makes it impossible to state that as a matter of law any one injury was resultant from the malfunction or defect of the device."  Dkt. No. 341 at 25.  Plaintiffs state that the ailments that Rouviere complained of "back in 2012-2015 are subject to interpretation since the defendant's own experts attribute these ailments in various body parts to a connective tissue disorder, generally genetic in nature."  *Id.*  Plaintiffs then appear to argue that the injury may not have presented itself "until the revision surgery done in 2016."  *Id.*

The facts upon which Defendant bases this motion, however, are not genuinely in dispute.  The legal conclusions she would have the Court draw do not follow.  *See Braunschidel*, 2013 WL 1337013, at *5 (rejecting argument that the statute of limitations defense raised a fact issue precluding summary judgment).  To the extent that Plaintiffs would now have the Court accept that the symptoms she experienced prior to May 2015 do not constitute part of the primary condition on which their claim is based, "[t]hat is not how" Plaintiffs pleaded their case,

---

[8] Plaintiffs argue that Defendant is precluded from arguing that these symptoms triggered the statute of limitations because Defendant's experts contend that these symptoms were not related to the malfunction of the device but were caused by Rouviere's underlying medical issues. Dkt. No. 341 at 19–20. The argument is a non-sequitur. A defendant may contend that it did not cause plaintiff's injury and that, if it did cause the injury, the plaintiff was aware of the injury more than three years before she brought suit.

25

**SA-85**

*Vuksanovich*, 2022 WL 2274543, at *7. Throughout this litigation, including in the amended complaint and Plaintiffs' briefing, interrogatory responses, as well as expert reports, Plaintiffs have proffered a theory of the case that the symptoms Rouviere suffered shortly after the 2012 surgery were attributable to the implementation of the devices. *See, e.g.*, Dkt. No. 26 ¶ 209; Dkt. No. 335-3 at 6 (Rouviere Interrogatory Response: "The device cause injury upon implementation, physiological instability, toxicity, and toxic result over time."); Dkt. No. 335-10. Plaintiffs also allege in the amended complaint that Rouviere suffered "elevated metal levels and instability" *prior* to the revision surgery and "[b]y the beginning of 2013, she experienced pain and loss of range of motion." Dkt. No. 26 ¶¶ 6, 11. These are key injuries that Rouviere claims were caused by implantation of Defendant's device. Joint 56.1 Statement ¶ 23 ("Among the injuries claimed by Ms. Rouviere in this action include physiological instability, pain . . . toxicity."). Plaintiffs cannot now state—solely for purposes of getting around the applicable statute of limitations—that it is unprovable whether any of these symptoms were, in fact, attributable to the devices and the only injury Plaintiff can be shown to have suffered was the revision surgery itself. *See Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 319 (N.D.N.Y. 2013) ("[A] party 'may not raise new claims or theories of liability for the first time in opposition to summary judgment.'" (citation omitted)); *Webadviso v. Bank of Am. Corp.*, 2010 WL 521117, at *2 (S.D.N.Y. Feb. 16, 2010) (Chin, J.) (Plaintiff "cannot now take a position, in an effort to defeat summary judgment, that so clearly contradicts the allegations of his own complaint."), *aff'd*, 448 F. App'x 95 (2d Cir. 2011).

Moreover, even if Rouviere subjectively believed that her ailments "were merely a continuation of h[er] pre-existing" conditions, "this is not a factor in the accrual of the statute of limitations." *Braunscheidel*, 2013 WL 1337013, at *4 (internal citations omitted). The record

26

SA-86

here, however, establishes that the ailments Rouviere suffered from were "new and different" and they "consistently impacted" her life. *Id.* at *4–5. Rouviere testified during her deposition that up until the August 2012 surgery she largely suffered from pain in her right hip as well as joint and ligament complaints, which were connected to her hip injury from her 2009 accident as well as her Ehlers-Danlos syndrome; however, after, the August 2012 surgery, Rouviere started to experience a host of new side effects throughout 2013 and 2014, including that her heart would start beating faster, "exertion was exhausting," her body was "tiring," and she was experiencing dizziness. Dkt. No. 316-6 at 84–89, 135–36, 145. Plaintiffs also submit expert opinions opining that these 2013 and 2014 symptoms were caused not by Rouviere's underlying medical conditions but by "excessive metal debris from the impacted hip components." Dkt. No. 335-8; *see also, e.g.*, Dkt. No. 335-9. In other words, this is not a case where the type of symptoms Rouviere suffered due to her underlying medical issues prior to her surgery were the identical symptoms that she suffered post-surgery and thus she would not have known she was injured. To the contrary, Rouviere testified that the nature of her ailments changed markedly after the surgery making it unmistakable that she would have known she was injured.

The case is also distinguishable from the cases that Plaintiffs cite in support of their argument that the time period of accrual raises a question of material fact. *Delaremore v. Zimmer, Inc.* arose at the motion to dismiss stage and the court decided that "further factual development" was necessary to determine when the statute of limitations accrued. 2019 WL 5394566, at *2 (E.D.N.Y. 2019); *see Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 136–37 (S.D.N.Y. 2016) (stating that "[t]he question of constructive knowledge and inquiry notice" in statute of limitations inquiries are "ill-suited for determination on a motion to dismiss"). The court reasoned that the complaint stated that the implant had caused plaintiff

27

**SA-87**

pain starting approximately in July 2013, but was "not prepared to accept as a matter of law that the 'pain' plaintiff allegedly felt in 2013 necessar[il]y constitutes a symptom" as it may have "been fleeting" or otherwise not be "indictive of his symptomology." 2019 WL 5394566, at *2. The court continued that "[t]his is not to say that plaintiff is going to have an easy time distancing himself from the statement in his original complaint." *Id.*  Unlike in *Delaremore*, this case arises after "factual development," and that factual development demonstrated that Rouviere's symptoms prior to the three-year period were not fleeting and were indicative of symptomology, as evidenced by Rouviere's numerous medical visits. In *Cerqua v. Stryker Corp.*, 2012 WL 5506119 (S.D.N.Y. Nov. 9, 2012), the court found that there was a question of fact as to when the accrual period started as a reasonable jury could find that the symptoms plaintiff suffered prior to 2009 were relatively minor and thus may not have sufficiently warned plaintiff that he had been suffering "from a 'condition' at all." *Id.* at *4.  Here, Rouviere's symptoms were not minor and, as she stated herself, impacted her qualify of life significantly at least as early as 2014.

Plaintiffs' personal injury claims are thus time-barred, and Defendant is entitled to summary judgment on these claims.

## II.     Implied and Express Warranty Claims

Defendant also argues that Plaintiffs' claims for implied and express warranty are barred by the statute of limitations. Dkt. No. 336 at 24.  Although Defendant notes that these claims seek damages for personal injury and thus should be barred under the three-year statute of limitations period discussed above for personal injury claims, Defendant argues that, even if this court applied the four-year statute of limitations for breach of warranty claims under New York law, the claims are nonetheless barred. *Id.*  Because this Court agrees that the breach of warranty

28

SA-88

claims are barred even if a four-year statute of limitations period applies, the Court does not address which of these two statute of limitations periods is more appropriate.

"Section 2-725 of the New York Uniform Commercial Code establishes a four-year statute of limitations for breach of warranty claims." *Baker*, 770 F. App'x at 15 (quoting N.Y. U.C.C. § 2-725). "For such claims, the statute begins to run when 'the product is placed in the stream of commerce or at the time of sale by the manufacturer.'" *Id.* (quoting *Schrader v. Sunnyside Corp.*, 747 N.Y.S.2d 26, 28 (2d Dep't 2002)). Here, the device at issue, which was implanted into Rouviere, must have been placed in the stream of commerce or been sold prior to the device being implanted into Rouviere on August 14, 2012. Because August 14, 2012 is more than four years prior to the May 2018 date that this action was initiated, the breach of warranty claims are time-barred. *See Galletta v. Stryker Corp.*, 283 F. Supp. 2d 914, 916 (S.D.N.Y. 2003) ("There is no question that the breach of warranty claim is time barred, because the polyethylene implant had to have been delivered to the hospital where the operation was performed prior to the date of the operation—April 23, 1996—and the lawsuit was not commenced until May 1, 2002.").

Plaintiffs' argument that the implied and express warranty claims are not time barred because they were tolled pursuant to N.Y. U.C.C. § 2–725(2) is unavailing. Under U.C.C. § 2–725(2), "[i]f a plaintiff demonstrates that the defendant made an explicit warranty as to the future performance of its device, that could toll the limitations period for an express warranty cause of action until the 'breach is or should have been discovered.'" *Guisto*, 293 F.R.D. at 137 (quoting N.Y. U.C.C. § 2–725(2)). Implied warranty claims, however, are not subject to tolling under U.C.C. § 2–725(2). *Id.*; *see Orlando v. Novurania of America, Inc.*, 162 F. Supp. 2d 220, 224 (S.D.N.Y. 2001) ("The [future performance] exception speaks to express warranties not implied

29

**SA-89**

warranties."). Moreover, Plaintiffs do not identify any express warranty that Defendant made as to the future performance of its device. *See Gelber v. Stryker Corp.*, 788 F. Supp. 2d 145, 166 (S.D.N.Y. 2011) ("A warranty of future performance is one that guarantees that the product will work for a specified period of time."). In support of this argument, Plaintiffs in their opposition brief quote only a statement made by Dr. Buly about the device. Dkt. No. 341 at 35. Thus, the statute of limitations is not tolled on this basis and summary judgment is granted in Defendant's favor on these claims.

### III.    Derivative Loss-of-Consortium Claim

Mr. Rouviere's loss of consortium claim is derivative of Rouviere's claims. Because Defendant is entitled to summary judgment on Rouviere's claims, summary judgment must be granted on the loss of consortium claim as well. *See Griffin v. Garratt-Callahan Co.*, 74 F.3d 36, 40 (2d Cir. 1996); *Rouviere v. DePuy Orthopaedics, Inc.*, 560 F. Supp. 3d 774, 802 (S.D.N.Y. 2021), *reconsideration denied*, 2021 WL 5854283 (S.D.N.Y. Dec. 9, 2021).

### IV.    Equitable Estoppel

Finally, Plaintiffs argue that Defendant is estopped from asserting any statute of limitations defense due to fraudulent concealment. Dkt. No. 341 at 28–29. Plaintiffs argue that Defendant's misrepresentations prevented Plaintiffs from timely commencing an action because Dr. Buly would never have implanted the device in Rouviere had he known that it would cause impingement and that it would result in the release of metals into Rouviere's body. *Id.* at 30. Plaintiffs state that Defendant made numerous misrepresentations in its filings with the Food and Drug Administration ("FDA") and deceived both the FDA and physicians about the true nature of the product. *Id.* at 31.

"Equitable estoppel is an 'extraordinary remedy.'" *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 442 (S.D.N.Y.), *aff'd*, 579 F. App'x 7 (2d Cir. 2014) (quoting *Pulver v.*

**SA-90**

*Dougherty*, 871 N.Y.S.2d 495, 496 (3d Dep't 2009)); *see also Roeder v. J.P. Morgan Chase & Co.*, 523 F. Supp. 3d 601, 616 (S.D.N.Y. Feb. 26, 2021), *aff'd*, 2022 WL 211702 (2d Cir. Jan. 25, 2022). It applies "where [a party] is prevented from filing an action within the applicable statute of limitations due to his or her reasonable reliance on deception, fraud or misrepresentations by the other." *Pulver*, 871 N.Y.S.2d at 496 (citation omitted). "Such fraud, misrepresentations, or deception must be affirmative and specifically directed at preventing the plaintiff from bringing suit; failure to disclose the basis for potential claims is not enough, nor are broad misstatements to the community at large." *Twersky*, 993 F. Supp. 2d at 442; *see Doe v. Kolko*, 2008 WL 4146199, at *4 (E.D.N.Y. Sept. 5, 2008) ("This argument demonstrates plaintiffs' fundamental misunderstanding of the equitable estoppel doctrine. Equitable estoppel is appropriate where the plaintiff is prevented from filing an action within the applicable statute of limitations due to defendants' misconduct toward the potential plaintiff, not a community at large."); *Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1184 (N.Y. 2012) ("[I]n cases where the alleged concealment consisted of nothing but defendants' failure to disclose the wrongs they had committed, we have held that the defendants were not estopped from pleading a statute of limitations defense.").

"The case law draws a distinction between misrepresentations made to the community at large, and specific misrepresentations or deceptive conduct sufficient to constitute a basis for equitable estoppel." *Roeder*, 523 F. Supp. 3d at 619 (cleaned up). "The former is insufficient to make out a claim for equitable estoppel 'in light of the specificity requirement in the equitable estoppel standard; equitable estoppel is only "appropriate where the plaintiff is prevented from filing an action within the applicable statute of limitations due to defendants" misconduct toward the potential plaintiff, not a community at large.'" *Id.* (quoting *Twersky*, 993 F. Supp. 2d at 445).

**SA-91**

In the case at hand, Plaintiffs' allegations of fraud on behalf of the Defendant—even if true—involve misrepresentations made to the community at large and thus are insufficient to justify equitably estopping Defendant from asserting a statute of limitations defense. *See Roeder*, 523 F. Supp. 3d at 619; *Twersky*, 993 F. Supp. 2d at 442. Plaintiffs allege that Defendant failed to disclose the true nature of its product from consumers, doctors, and the FDA *generally*. Plaintiffs do not allege that any of these statements or concealments were specifically directed at Plaintiffs or, even more specifically, directed at preventing Plaintiffs from timely filing suit. *See Roeder*, 523 F. Supp. at 620 (statement to a third party may be sufficient to invoke equitable estoppel "if it is directed to a plaintiff or intended to frustrate his ability to timely sue"). Accordingly, these allegations are not of the type that justify the application of equitable estoppel, a doctrine which is to be invoked "only under exceptional circumstances." *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 265 (S.D.N.Y. 2006) (citation omitted); *see Roeder*, 523 F. Supp. 3d at 620 (rejecting equitable estoppel argument where "there are no plausible allegations" that the statement was "directed to Plaintiffs as opposed to the more general public in response to public concerns").

## CONCLUSION

The motion for summary judgment is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 332, 345. The Clerk of Court is also respectfully directed to close this case.

SO ORDERED.

Dated: December 5, 2022
      New York, New York
                                      LEWIS J. LIMAN
                                United States District Judge

32

**SA-92**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X
JODI ROUVIERE and ANDRE ROUVIERE,

                 Plaintiffs,

      -against-                             18 **CIVIL** 4814 (LJL)

                                              **JUDGMENT**

HOWMEDICA OSTEONICS
CORPORATION d/b/a STRYKER
ORTHOPAEDICS,

                 Defendant.
--------------------------------------------------------------X

      It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated December 5, 2022, Defendant's motion for

summary judgment is GRANTED; accordingly, the case is closed.

**Dated:** New York, New York

       December 6, 2022

                                        **RUBY J. KRAJICK**

                                    _____
                                        **Clerk of Court**

               **BY:**          *K. Mango*

                                      _____
                                         **Deputy Clerk**

UNITED STATES DISTRICT COURT SOUTHERN
DISTRICT OF NEW YORK
------------------------------------------------------------------X
JODI ROUVIERE and ANDRE ROUVIERE,

                     Plaintiffs,

        -against-                                18 **CIVIL** 4814 (LJL)

# **JUDGMENT**

DEPUY ORTHOPAEDICS, INC. n/k/a MEDICAL
DEVICE BUSINESS SERVICES, INC. and HOWMEDICA
OSTEONICS CORPORATION d/b/a
STRYKER ORTHOPAEDICS,

                     Defendant.
------------------------------------------------------------------X

      It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated September 17, 2021, (ECF Doc. No. 318)

Defendant DEPUY ORTHOPAEDICS, INC.'s motion for summary judgment is GRANTED.

**Dated:** New York, New York
      January 4, 2023

                                                                  U.S.D.J.